Helen Reabe **SOBOSLE**, Appellant,

v.

**UNITED STATES STEEL CORPORATION.**

No. 15322.

United States Court of Appeals Third Circuit.

Argued Nov. 29, 1965.

Decided April 19, 1966.

8

Hymen Schlesinger, Pittsburgh, Pa., for appellant.

Paul A. Manion, Pittsburgh, Pa. (Ira R. Hill, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for appellee.

Before HASTIE, GANEY and FREEDMAN, Circuit Judges.

FREEDMAN, Circuit Judge.

This admiralty appeal deals with a seaman's right to additional maintenance and cure. It arises out of an old injury and requires consideration of the earlier

proceedings which the seaman brought against the shipowner.

Twenty years ago, on August 9, 1946, libellant was employed as a chambermaid on a vessel owned and operated by Carnegie-Illinois Steel Corporation, now United States Steel Corporation. On that day while in the course of her employment libellant suffered apparently slight injuries about the head and left shoulder. She brought two actions against respondent, one under the Jones Act for negligence and the other in admiralty for maintenance and cure. The Jones Act claim was denied on the ground that the accident resulted solely from libellant's own negligence. Reabe v. Carnegie-Illinois Steel Corporation, 100 F. Supp. 726 (W.D.Pa.1951). She was, however, awarded maintenance and cure amounting to $5,424 in the admiralty action, on the ground that she was suffering from a "functional nervous condition" caused by her injuries, which totally disabled her for work from March 30, 1947[1] until the time of the trial, March 14, 1951,[2] and that this disability "may continue in the future." The District Judge stated in his opinion: "The testimony has convinced me that further treatment will be of benefit to the libellant." Reabe v. Carnegie-Illinois Steel Corporation, 100 F.Supp. 728, 730 (W.D. Pa.1951).

Eight months later, on July 17, 1952, libellant, now Mrs. Sobosle, filed a new libel in admiralty for maintenance and cure for the period beginning March 14, 1951, the date of the prior trial. After a trial held on May 21 and 24, 1957, the District Judge, on June 5, 1957, found that libellant was still suffering from the functional nervous condition at the time of the trial, that the finding on the prior libel that this condition was caused by the original injuries was binding, and that this condition had totally disabled her from working. He also found that her condition had progressively worsened as a result of respondent's neglect to afford her the medical care which the court had previously found that she required and which respondent was legally obliged to provide, and that her condition would be improved in the future by medical care. A new award, amounting to $10,569, was made for maintenance and cure from March 14, 1951 to May 27, 1957. In the course of his opinion, the District Judge said: "It is my suggestion that the seaman make immediate arrangements to secure the medical attention and treatment that has been recommended by her attending physician [Dr. Max H. Weinberg], and it would seem most practical and realistic that the defendant shipowner agree to make provision to underwrite the cost of this expense. I make this recommendation for the reason that maintenance and cure must continue until every approach reasonably known to medical science is applied in an effort to cure the seaman and if the suggestion is followed, the parties and the court will within a reasonable length of time in the future be able to know the answer to this most unfortunate situation." Sobosle v. United States Steel Company, 151 F.Supp. 767, 768–769 (W.D.Pa.1957).

The order, in addition to the award of maintenance and cure, went on to state that since libellant was in need of medical care immediately, the court, as guardian of the seaman, directed that she promptly place herself under the care of Dr. Weinberg, and that he make written monthly reports to the court regarding his treatment and inform the court when in his opinion the seaman was cured, the disability had become permanent, or the maximum cure possible had been effected. On July 8, 1957 libellant entered a sanatorium for the further treatment recommended by Dr. Weinberg. She remained there for eight weeks and the cost, amounting to $773.46, was paid by respondent. On August 26, 1957, Dr.

---

1. Libellant had worked from the date of the accident until March 30, 1947, when she entered the Marine Hospital at Pittsburgh.

2. A period of about three months when libellant had been afforded hospitalization, was excluded from the award.

Weinberg wrote to the District Judge recommending that libellant be transferred to a Pittsburgh hospital for shock therapy. Shortly afterward, on September 7, 1957, he informed the District Judge that libellant had not submitted to the shock therapy but instead had left the sanatorium and returned home, and that he could do nothing further. The District Judge thereupon directed the parties, their counsel and the attending physician, to appear before him to show cause why an order should not be entered terminating maintenance and cure as of the date of libellant's refusal to comply with the direction of her attending physician.

At the hearing Dr. Weinberg made it clear that in his opinion libellant was incompetent to such a degree that appointment of a guardian would be justified. He thought libellant was then a paranoid case and described as superstitious her fearfulness of the effects of the treatment on her daughter.

On October 3, 1957, the court entered two orders. In one, respondent's liability for maintenance and cure was terminated as of September 7, 1957. In the other, the court found that libellant's failure to accept shock treatment was "due to difficulties and involvements which exist in the family relationship of the seaman with her husband and daughters, and coupled with the neurosis and anxieties of the seaman," and that if she "had her normal faculties and was not subject to the involvements heretofore expressed, she would have [accepted the treatment]." In these circumstances the court found that "a duty exists for the court to make available to the seaman appropriate relief if and when circumstances change." The court therefore made the first order subject to the condition that if Dr. Weinberg at any time should certify that libellant's condition could be improved by further medical treatment, and if she should be willing to submit herself for the treatment recommended by Dr. Weinberg, and if appropriate members of the family required by Dr. Weinberg and the hospital to agree in writing before such treatment was rendered should do so, the court on appropriate petition would set the matter for hearing, "after which such order will be entered by the court as the circumstances and the law require as to whether further treatment will be authorized or directed to be given as recommended by Dr. Max H. Weinberg at the expense of the United States Steel Corporation". The order stated: "If compliance is not made in all respects with this order, the decree entered on the 3rd day of October, 1957, terminating maintenance and cure as of September 7, 1957, will remain final and conclusive in all respects."

Almost seven years later, on September 2, 1964, libellant filed the present petition for modification of the order of October 3, 1957. She alleged that in the intervening period she and her husband had been divorced,[3] Dr. Weinberg had died on August 29, 1962,[4] and she had been examined on March 24, 1964, by another physician, Dr. B. J. Johnston, who had found that she was totally and permanently disabled due to the injuries she sustained, complicated by a post-traumatic mental disorder, and had recommended hospitalization for physical therapy and other treatment. He specifically recommended against shock therapy. Attached to the petition was the written consent of her daughter to the order of October 3, 1957, and to any treatment which might be ordered by the court. The prayer of the petition apparently was fashioned on the view that the order of October 3, 1957, barred the filing of a new libel; it therefore sought modification of the order to permit libellant to bring a new action for additional maintenance and cure.

At the hearing on petition and answer, no testimony was taken, but the court,

---

3. The date of the divorce, June 26, 1958, was stated in the joint stipulation which is referred to below.

4. The date of Dr. Weinberg's death was later stated in the joint stipulation.

on September 25, 1964,[5] directed that counsel for the parties confer and file a stipulation as to all facts not in dispute, and that counsel for libellant file a statement setting forth in detail the facts on which libellant relied in support of her petition and the names of the witnesses who would testify to them. Later the parties jointly filed a stipulation which consisted largely of the record facts and libellant filed a separate "offer" to prove that she was mentally and emotionally incapable of rational decisions, that shock treatment might be both ineffective and harmful, that she and her family were fearful that brain damage might result from it, and that a more conservative therapy would improve her condition. Dr. Johnston and another physician were listed as witnesses who would testify on her behalf.

On November 25, 1964, without any further hearing or the taking of testimony, the court, evidently treating the petition as a direct application for further maintenance and cure, denied it on two grounds: (1) because libellant had voluntarily refused to undergo the prescribed treatment of Dr. Weinberg; and (2) because she was barred by laches.

The obligation of the shipowner for the maintenance and cure of a seaman continues, once it has attached, until the seaman has attained the utmost cure possible, unless he wilfully and unreasonably refuses the medical aid which would benefit him.[6] The relationship between the seaman and the shipowner is unique. Although it is founded on contract, the special nature of the seaman's situation and the role of the shipowner who stands *in loco parentis* to him[7] creates a status some of whose attributes are imposed on the parties by the law regardless of their bargaining. It is because of this status that the conduct of the seaman is viewed with a solicitude much different from the objectivity which prevails in judging transactions between strangers. So it has been said that whether a seaman breached his duty to make it known to his prospective employer that he is unfit for service, and thus lost the right to maintenance and cure, will be determined by a subjective view of what he thought appropriate.[8] The admiralty law recognized and developed a right to maintenance and cure which differs vastly from the strict and impersonal doctrines which surround the law of negligence. Because of admiralty's ancient interest in the rights of the seamen who are its wards a shipowner's obligation to supply maintenance and cure may be revived by the subsequent appearance of new means of treatment after it has been discharged by the apparent achievement of maximum cure.[9] Similarly, a shipowner does not discharge his obligation to furnish maintenance and cure if because of the seaman's physical or emotional condition he should not only make it available to him, but should, in addition, get him to

---

5. The Order was dated September 25, 1964; it was filed September 28, 1964.

6. Gardner v. Sinclair Refining Co., 227 F.2d 958 (3d Cir. 1955); Luth v. Palmer Shipping Corp., 210 F.2d 224 (3d Cir. 1954), cert. denied, 347 U.S. 976, 74 S. Ct. 788, 98 L.Ed. 1116 (1954).

7. Farrell v. United States, 336 U.S. 511, 516, 69 S.Ct. 707, 93 L.Ed. 850 (1949); Cortes v. Baltimore Insular Line, Inc., 287 U.S. 367, 370–373, 53 S.Ct. 173, 77 L.Ed. 368 (1932); Murphy v. American Barge Line Co., 169 F.2d 61 (3d Cir. 1948), cert. denied, 335 U.S. 859, 69 S. Ct. 133, 93 L.Ed. 406 (1948); Story, Circuit Justice, in Harden v. Gordon, Fed. Case 6047, 11 Fed.Cas. 480, 483, 485 (C. C.Me.1823).

8. Burkert v. Weyerhaeuser Steamship Co., 350 F.2d 826 (9th Cir. 1965); compare Gray v. Bernuth, Lembcke Co., 88 F.Supp. 586 (E.D.Pa.1949), Id., 89 F. Supp. 153 (1948), with Lindquist v. Dilkes, 127 F.2d 21, 24 (3d Cir. 1942); see Annotation, 3 A.L.R.3d 1082, 1095 (1965).

9. See Farrell v. United States, supra, 336 U.S. at 519, 69 S.Ct. 707, 93 L.Ed. 850; Myers v. Ishmian Lines, Inc., 282 F.2d 28, 32 n. 4 (1st Cir. 1960), cert. denied, 365 U.S. 804, 81 S.Ct. 469, 5 L.Ed.2d 461 (1961); Scott v. Lykes Bros. Steamship Co., 152 F.Supp. 104 (E.D.La.1957); Gilmore & Black, The Law of Admiralty (1957), § 6–11, p. 265.

the place of cure.[10] We therefore must be mindful in the present case of the extent to which the seaman's conduct was influenced by her mental or physical incapacity in determining whether her failure to accept medical aid should result in the absolute termination of this shipowner's duty to continue providing maintenance and cure. Where medical care has been put beyond her reach by mental illness or emotional fears rather than by wilfulness, her unwillingness to accept it may not terminate the duty but merely suspends it, as when maximum cure is apparently achieved, until means of treatment become available to her. In so doing admiralty recognizes the human rights that are involved, judging the seaman as he is,—subjectively, rather than as he might have been,—objectively, if he were someone else.

■ Here the court found that libellant failed to submit to the recommended treatment because of difficulties existing in her family situation, coupled with her anxieties and neurosis, which deprived her of her normal faculties. The court made no finding of wilful refusal of medical help, and the proofs negatived such a conclusion; indeed, the court's refusal to order maintenance and cure terminated absolutely implies that it found no wilfulness. Accordingly, the order of October 3, 1957 merely suspended libellant's right to maintenance and cure during the period in which she had in effect attained the maximum cure then realistically available to her because of her family circumstances and her mental condition.

When the remission of libellant's anxieties and fears made a useful remedy acceptable to her and therefore in fact available, it could no longer be said that she had attained the maximum available cure. The order does not bar relief in such a case, for maintenance and cure was not absolutely terminated. This is all the more true where, as is now alleged, the new remedy is one which previously had not even been offered to her and therefore had never been refused. Libellant has offered to prove that a useful alternative remedy now exists and the record indicates her willingness to avail herself of it. Her offers of proof may well raise issues of fact which it will be necessary in due time to resolve, but the 1957 order did not shut the door on a new libel claiming maintenance and cure beginning at the time when she claims new medical relief became available to her through Dr. Johnston in 1964.

We do not construe the order of October 3, 1957 to mean that the suspension of maintenance and cure could be lifted in the future only if libellant submitted to Dr. Weinberg's recommended treatment. It would be a confusion of the end with the means if the designation of Dr. Weinberg were construed to mean that no remedy administered by anyone else was ever to be available to her. For such a construction of the order would mean that it was to be meaningless in the event Dr. Weinberg had died very shortly after it was entered, or if he had become unavailable by retirement or removal from the locality. Indeed, Dr. Weinberg himself might later have come to the view that some less drastic remedy would be beneficial. Dr. Weinberg's death therefore could not have been meant to foreclose all possibility of finding a remedy to relieve libellant's condition and thus increase the extent of her cure.

■■ There remains the question of laches. It is true that much time has elapsed. If this is deemed a hardship on the respondent, it is also true that during this long period respondent has been relieved from providing maintenance and cure.

Laches, of course, requires more than lapse of time; as an equitable defense it is determined in the light of all the existing circumstances and requires that the delay be unreasonable and cause

---

10. E. g., Murphy v. American Barge Line Co., supra; Spellman v. American Barge Line Co., 176 F.2d 716, 719–720 (3d Cir. 1949).

prejudice to the adversary.[11] The first question here is whether the delay was unreasonable in the circumstances of this case, where libellant claims that she was mentally and emotionally unable to act.[12] Although the court below held that the delay was unreasonable, there is no indication that the libellant's mental and emotional circumstances which had been so fully described, were brought into the focus of this question. The other question is whether respondent has been sufficiently prejudiced by the delay to require a finding of laches.[13] The court below held that respondent has been prejudiced by Dr. Weinberg's death. It is true that Dr. Weinberg will not be available as a witness for the respondent, but it must be remembered that he was libellant's physician. His death has deprived her of the benefit of his understanding of her condition and of the opportunity to know whether he now would agree with her present physicians. In the present state of the record there has been no medical testimony except that of Dr. Weinberg. It is possible that the testimony of libellant's new doctors may provide elements which will have a bearing on the question of laches.

For these reasons libellant should not have been summarily deprived of the opportunity to present whatever additional evidence there may be available to her on the two elements of laches,—the reasonableness of her delay in view of her condition and the prejudice suffered by respondent.

In a proceeding de novo on a new libel respondent will have an opportunity to present its defenses, including laches and wilful rejection of medical care after 1957, and the factual issues which they may raise will be presented for determination on a complete record. We do not,

of course, now indicate in any way what the decision of the court below should be in the new proceeding. The substantive rights of the parties and the defense of laches all will be appropriate for consideration after a new libel has been filed and the case has proceeded in due course.

Libellant sought merely a modification of the 1957 order so that she could file a new libel, and the parties and the court below assumed that without such modification a new libel could not be filed. We believe that the dismissal of the petition was erroneous and that libellant is entitled to have the supposed bar removed by a modification of the order so that she may file a new libel.

The order of the court below therefore will be vacated and the cause remanded with direction that the prayer of the petition be granted.

11. Czaplicki v. The Hoegh Silvercloud, 351 U.S. 525, 533–534 (1956) ; Claussen v. Mene Grande Oil Co., 275 F.2d 108, 111 (3d Cir. 1960) ; The Fulton, 54 F.2d 467 (2d Cir. 1931).

12. See Hughes v. Roosevelt, 107 F.2d 901, 903 (2d Cir. 1939) ; McDaniel v. Gulf & S. Amer. Steamship Co., 228 F.2d 189

(5th Cir. 1955) ; compare Conard v. Stitzel, 225 F.Supp. 244 (E.D.Pa.1963).

13. See Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 215–216, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963) ; Claussen v. Mene Grande Oil Co., supra; see Larios v. Victory Carriers, Inc., 316 F.2d 63 (2d Cir. 1963).