Antonio LIPARI, Appellee,

v.

**MARITIME OVERSEAS CORPORA-TION, Appellant.**

**No. 73–1448.**

United States Court of Appeals, Third Circuit.

Argued Nov. 5, 1973.

Decided Feb. 7, 1974.

Mark D. Alspach, C. A. Putz, Krusen, Evans & Byrne, Philadelphia, Pa., for appellant.

William Goldstein, Paul M. Goldstein, Philadelphia, Pa., for appellee.

Before VAN DUSEN, HUNTER and GARTH, Circuit Judges.

GARTH, Circuit Judge.

This appeal involves a claim for maintenance and cure brought by the plaintiff (appellee) seaman Lipari, against the defendant (appellant) shipowner Maritime Overseas Corporation (hereinafter "Maritime").

On October 29, 1969 plaintiff instituted a suit against Maritime claiming damages under the Jones Act (46 U.S.C. § 688), as a result of an accident sustained by him while a member of the crew of defendant's vessel "Overseas Traveller". The accident had occurred on August 15, 1969 when without warning, a boom fell toward, but did not reach, the deck on which Lipari was working. Had the boom fallen all the way, the plaintiff and several other crew members on deck at that time might easily have been killed or severely injured. Thereafter, as a result of this incident, Lipari complained of nervousness and anxiety.

On June 9, 1972 plaintiff instituted this action to recover maintenance and cure stemming from the August 1969 accident. The damage and maintenance actions were consolidated for trial, which commenced with a jury on June 21, 1972. At the conclusion of trial, the District Court submitted 11 interrogatories to the jury. These interrogatories were answered on June 27, 1972, and resulted in the entry of a judgment in favor of the plaintiff.[1]

---

1. The District Court directed the entry of judgment on the damage action in favor of the plaintiff and against the defendant in the amount of $33,333.33 plus costs. The jury found that the defendant was negligent; that the negligence caused the plaintiff's injury; that the plaintiff was contributorily negligent to the extent of 33⅓% and that the total amount of plaintiff's damage exclusive of contributory negligence was $50,000.

Interrogatories Nos. 9, 10 and 11 which have relevance to the maintenance and cure proceeding were answered by the jury as follows: the plaintiff sustained his injury while in the sea service of the defendant; he is still suffering from the injury (ill-

Thereafter, the court, sitting without a jury, received evidence and heard argument with respect to the issue of maintenance and cure and found that: (1) psychotherapy of the type that would benefit the plaintiff was not available to him; (2) no such psychotherapy treatment was ever offered to the plaintiff (by the defendant); (3) the plaintiff was unaware that he (the plaintiff) could get the type of psychotherapy necessary to benefit him; and (4) there was no evidence that plaintiff ever rejected such treatment.

Accordingly, on March 21, 1973, judgment in the amount of $4,456 was entered against the defendant, representing payment of maintenance and cure for the period November 24, 1970 to June 27, 1972, excluding a period of hospitalization from December 28, 1971 to January 22, 1972.[2] This appeal from the order of March 21, 1973, concerned only with the judgment as it pertained to maintenance and cure, followed.

### I.

Lipari, a merchant seaman,[3] while in the service of Maritime's vessel "Overseas Traveller" was almost struck by a falling boom on August 15, 1969. As a result of this accident, Lipari developed a nervous condition which caused him to leave the vessel when it reached its next port (Amsterdam). At his own expense, he thereafter returned to the United States, reporting on September 2, 1969 to the United States Public Health Service facility in New York, where he commenced out-patient treatment for his emotional condition. He remained under out-patient care, marked "not fit for duty", until December 4, 1969, at which time he was declared "fit for duty". He re-shipped aboard the first available vessel and served from January 29, 1970 until May 2, 1970, at which time he left the ship ("Newark") to make arrangements for his brother's funeral. Thereafter he re-registered, but his next assignment was not until October 16, 1970 when he joined the "Trans Idaho".[4]

His nervous condition again resulted in his leaving his ship (now the "Trans Idaho"). He returned to the Public Health Service in New York on November 24, 1970. The record of that psychiatric examination includes among other things: ". . . post-traumatic, chronic excessive phobic reaction. . . . This man is not fit for duty. He is permanently 100% disabled for sea duty by virtue of his chronic insistent reaction to an accident fifteen months before. He should be given a medical retirement."[5]

Lipari was told by the Public Health Service that he was to return in 2½ months. He did not, but rather went home to Montreal, Canada, where he commenced work as a part-time taxicab driver.

The evidence discloses that Lipari did not seek any medical treatment of any sort whatsoever from November 24, 1970 until June 4, 1971. On June 4, 1971 and again on June 11 and July 2, 1971 he visited an orthopedic physician (Dr. Lemaire at Sacre-Coeur Hospital, Montreal) for a back problem, unrelated to either his service aboard the defendant's vessel or his psychiatric disability.

ness); and he will benefit from treatment or psychotherapy in the future. The defendant does not contend that the evidence was insufficient to support these answers.

2. The parties stipulated that if a judgment was entered for maintenance and cure, it would be at the rate of $8 per day; that there were 557 days within the calculated period and that the total therefore would be $4,456. The judgment when entered further provided that it was without prejudice to Lipari's rights to recover such maintenance to which he might be entitled subsequent to June 27, 1972.

3. Lipari, a resident of Montreal, Province of Quebec, Canada, first went to sea in 1941 at the age of 17.

4. The defendant Maritime neither owned or operated the vessels "Newark" or "Trans Idaho".

5. On this appeal plaintiff's claim is for maintenance and cure only for the period November 24, 1970 to June 27, 1972, excluding December 28, 1971 to January 22, 1972 when he was hospitalized in Montreal.

On July 15, 1971 at the request of Lipari's attorney, Lipari was examined by Dr. Alexander Silverstein, a Philadelphia psychiatrist, who recommended psychotherapy for approximately one to four years, three to four times a week, in order to ". . . help him [Lipari] gain insight into the mechanism of his condition and, hopefully, bring him back to his former level of adaptability and eventually return to the work he is best suited to do."

After this examination, Lipari returned to Montreal and his cab driving. Again he sought no treatment of a psychotherapeutic nature.

On December 28, 1971, Lipari was hospitalized at Sacre-Coeur Hospital in Montreal. The hospital record reveals that a number of tests and laboratory analyses were performed, none of which appear to have direct relevance to any psychiatric involvement.[6]

Thereafter, (June 2, 1972) on the eve of instituting this action for maintenance and cure, Dr. Silverstein again saw the plaintiff.

Two other facts are relevant to our discussion. On June 9, 1972 Lipari's counsel wrote to Maritime's counsel setting forth the information that Dr. Silverstein would be used as plaintiff's medical expert witness. Demand was made in that letter for defendant to respond in maintenance and cure from November 24, 1970.

After the jury verdict, but prior to the entry of judgment for maintenance and cure, Maritime entered into evidence the deposition of Dr. Evan McCallum, Medical Director of the Montreal General Hospital in Canada. That testimony revealed that free medical care, including psychiatric care (psychotherapy), was available in Montreal at the relevant times in question, and information to that effect had been generally made public.

## II.

It is the duty of a vessel and her owner to provide maintenance and cure for seamen injured or falling ill while in the service of the vessel. Maintenance and cure is not compensatory; it is supportive and curative. Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938); Sobosle v. United States Steel Corporation, 359 F. 2d 7 (3d Cir. 1966).

The seaman's right to maintenance and cure is not without its obligations. He, the seaman, must act with reasonable diligence to ascertain the nature of his illness and his need for treatment, and he must seek the necessary treatment to correct the illness or injury. Repsholdt v. United States, 205 F. 2d 852 (7th Cir. 1953); Bowers v. Seas Shipping Co. Inc., 185 F.2d 352 (4th Cir. 1950).

Seamen have been precluded from their right to maintenance and cure when they have failed to fulfill these obligations Repsholdt v. United States, *supra,* or (absent mitigating circumstances) when they have voluntarily rejected hospital care. Luth v. Palmer Shipping Corp., 210 F.2d 224, 228 (3d Cir. 1954); Murphy v. American Barge Line Co., 169 F.2d 61, 64 (3d Cir.) cert. den. 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (1948). Seamen must also keep the cost of maintenance and cure to a minimum. Wiseman v. Sinclair Refining Company, 290 F.2d 818 (2d Cir. 1961).

Further, while it may not terminate the duty of maintenance and cure, the failure to resume treatment by reason of mental or emotional illness, may

---

6. Although the plaintiff claims to have told both the orthopedic physician in June of 1971 and the physicians at Sacre-Coeur Hospital of his nervousness and emotional problem, nothing appears in any of the medical records which would reflect that information. To the contrary, the various tests and laboratory analyses appear centered upon pathological or organic abnormalities. The final hospital diagnosis was listed as "Normochrome, normocytary anaemia, of uncertain aetiology (mild)" and the secondary diagnosis as "Emaciation, probably through malnutrition. Sedimentation very high without known aetiology. Possibility of slight urinary infection."

suspend that right for the period during which the seaman fails to submit to the prescribed treatment. Sobosle v. United States Steel Corporation, *supra*.

With these principles in mind, we turn to the findings made by the District Court to determine whether they are supported by competent evidence, or whether they are clearly erroneous and are to be set aside. *See* Luth v. Palmer Shipping Corp., *supra*.

## III.

*Availability of Treatment*

■ The District Court found that "after a study of all the evidence, including the deposition presented of Dr. McCallum, there is no showing that psychotherapy of the type that would benefit Mr. Lipari was available to Mr. Lipari."

Conceding that psychiatric treatment was indicated, was there evidence before the District Court to show that such treatment was not available to Lipari?

Lipari himself testified that when he had been declared permanently 100% disabled for sea duty by the United States Public Health Service on November 24, 1970, no psychotherapy treatment was offered to him by the Public Health authorities. He admits, however, that he was told that he would have to return to that facility at least every 90 days in order to "retain my seniority like free medical attention." (Tr. 121a). He further testified that he did not go back "due to the fact that it cost money, and also *I had free medical attention in Canada,* . . ." [emphasis supplied] (Tr. 122a). On cross examination, he explained the instruction given to him by the United States Public Health Service to return in 2½ months by stating: "they didn't tell me to return in 2½ months. They told me that if I wanted to keep my eligibility for free medical care I would have to

return at least every 90 days. And he told me he would put a date about 2½ months. And I was to call up before going in, if I wanted to keep my eligibility. . . . Due to the fact I was living in Montreal and it cost money to go to New York, and I have free medical care in Montreal, I didn't go back to the Public Health in New York." (Tr. 191a–7).

Dr. McCallum, a Medical Director of the Montreal General Hospital in Canada, testified as to both a hospitalization and a Medicare program available to residents and citizens of the Province of Quebec, Canada, and hence available to plaintiff at the relevant times disclosed by this action. These programs afford hospital care and medical out-patient or in-patient care free of charge to Montreal residents. The hospitalization program had its inception in or about 1962 and the Medicare program was activated in 1969. Specifically, the doctor testified that the type of psychotherapy recommended by Dr. Silverstein for the plaintiff was available free of charge in Montreal, and if not at the Sacre-Coeur Hospital in Montreal, at a specialized psychiatric institution (Albert Prevost Hospital) no further than three miles away from Sacre-Coeur.

Dr. McCallum testified that in 1969, when the Medicare system was initiated, information as to the program was disseminated in the public media, press and radio by the governmental agency responsibile for the administration of the medical and hospital program.

The record is barren of *any* evidence indicating the unavailability of free medical service to the plaintiff.[7] Accordingly, the finding of the District Court in this respect cannot be sustained.

*Awareness of Available Treatment*

The District Court found that Lipari was not aware of the availability to him

---

7. We note that the plaintiff availed himself of these various free services when he visited Dr. Lemaire for his back ailment in June

and July, 1971 and again when he was hospitalized from December 28, 1971 to January 22, 1972.

of psychiatric treatment. In making that finding, the District Court's attention was focused upon and restricted to the plaintiff's knowledge of the availability of a specific type of treatment (psychotherapy). We think this view of the issue and proofs is too narrow.

■ The appropriate inquiry here is the awareness of available free general medical services. All other inquiries having to do with the *kind* of medical treatment or procedure available, are immaterial.[8]

Lipari's testimony is direct and unequivocal that he knew of the availability of free medical service in New York, but chose not to avail himself of treatment there. He asserted time and again that he knew of free medical service in Montreal through the Medicare program, and in fact he sought and obtained its benefits when he consulted Dr. Lemaire for his back problems and when he was hospitalized at Sacre-Coeur Hospital in December 1971. Lipari having knowledge that general medical services were available to him in Montreal, and without charge, it is immaterial whether Lipari also knew the specific availability of a particular treatment, therapy, diagnostic aid or procedure, which might be prescribed by the medical authority responsible for his care.

Hence, we hold that under the facts of this case, all that is required for the resolution of this issue is proof by the defendant that the plaintiff had knowledge of free general medical services. That proof is undisputed by the plaintiff's own testimony.

*Failure to Offer Treatment*

We agree with the District Court that the evidence shows defendant failed to "offer" treatment to Lipari after November 24, 1970. That finding, however, even if supported by evidence, does not dispose of the issue before us.

■ The crucial inquiry is whether there is evidence in the record which would reveal the defendant's knowledge of the need to make an "offer" of treatment, for that evidence is a prerequisite to the ultimate finding concerning Maritime's obligation. If Maritime did not know or could not have known of the plaintiff's need for treatment, the finding of the District Court with respect to defendant's failure to "offer" is irrelevant.

■ On November 24, 1970 Lipari had been declared not fit for duty and permanently disabled, thereby terminating the defendant's obligation to provide maintenance and cure. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949); Brown v. Dravo Corp., 258 F.2d 704 (3d Cir. 1958); Desmond v. United States, 217 F.2d 948 (2d Cir. 1954). The defendant's obligation to this date had been met; it had no further obligation with respect to maintenance and cure absent extenuating circumstances and requisite knowledge. *See* Murphy v. American Barge Line Co., *supra.*

The defendant argues that after November 1970, Lipari had never given it such notice of his condition as would require the defendant to respond with an offer of maintenance and cure,[9] and, in

8. We do not believe that even the plaintiff would contend that the defendant in an appropriate case would be obliged to prove the plaintiff's knowledge of available free procedures such as rectosigmoidoscopy, urethrocystoscopy, hepatosplenic cartograph, etc. Yet these are just a few of the many tests provided without charge to Lipari during his hospitalization at Sacre-Coeur Hospital.

9. The plaintiff contends that had Maritime pursued certain avenues of discovery in the *damage* action which had been commenced in

1969, facts might have surfaced giving the defendant earlier notice of the 1971 findings of Dr. Silverstein. In effect plaintiff argues that the defendant had an obligation to propound interrogatories to plaintiff which would have elicited such information.

We note that the plaintiff's deposition was taken by Maritime on June 4, 1970 approximately one year before Dr. Silverstein's prognosis. Despite that circumstance, and even without reference to the rules prescribing the time of completion of discovery by parties, we are not persuaded that there is

addition, it had lost touch with Lipari, who had returned to his home in Montreal, Canada. Accordingly, the defendant argues that it could not have offered treatment to Lipari during the period November 24, 1970 through June 1972 as it had no knowledge of the need for such treatment.[10]

While in Montreal, Lipari consulted an orthopedic physician for a back sprain and was hospitalized at the Sacre-Coeur Hospital. Neither the physician's nor the hospital's record indicates that information as to these visits had been conveyed or made known to Maritime. Even had the out-patient file of Dr. Lemaire been disclosed to defendant, it would have shown nothing pertaining to any psychiatric disturbance. The four visits to Dr. Lemaire on June 4, 11, 25, and July 2, 1971 deal solely with the diagnosis and treatment of a lumbar sprain. Similarly, the hospital record for the period December 28, 1971 to January 22, 1972 indicates nothing regarding mental or emotional disturbances, but rather reveals only a diagnosis and treatment of physiological ailments. Hence, the defendant, even if it had been privy to these records, would not have known of any psychiatric involvement of Lipari and could not have known that there had been a change in his condition from the "permanent disability" status recorded by the United States Public Health Service. In fact, even though the plaintiff claims that he told both Dr. Lemaire and the physicians at the hospital of his nervousness and anxiety, this could not have supplied the underlying obligation necessary to compel an "offer" of treatment by Maritime for plaintiff's emotional distress, for this was the very ailment for which

he, the plaintiff, had been certified not fit for duty.

On July 15, 1971, apparently for the first time plaintiff was informed (by Dr. Silverstein) that he could benefit from psychotherapy and that with treatment there was hope that he could return to his former vocation. This information, however, was not imparted to the defendant until some time after June 9, 1972.[11] Accordingly, during the period from November 24, 1970, the date on which Lipari was declared not fit for duty, and, at the earliest, June 9, 1972, the defendant: (a) knew that its obligation to pay maintenance and cure had been terminated; (b) had no communication or contact with Lipari; and (c) did not know of any benefit that treatment could afford. Under these circumstances, it is difficult to comprehend how or why psychiatric treatment could or should have been made available to Lipari by the defendant.

■ We decline to hold the defendant has the duty of providing or offering treatment when it had no knowledge of Lipari's need for treatment and when Lipari had failed to notify it of his need. *See* Repsholdt v. United States, *supra.* The evidence is clear that Maritime received notice of Lipari's change in status no earlier than June 9, 1972. It is also clear that no treatment had been sought for this ailment by Lipari, at least through June 27, 1972, the date on which the jury returned with its answers to the Court's interrogatories. Accordingly, the District Court's finding cannot be sustained.

*Evidence of Rejection of Treatment*

■ The District Court found that there was no evidence that Lipari had

---

an obligation on a defendant to continue utilizing all discovery mechanisms up to the time of trial.

10. Maritime contends that its last direct contact with Lipari was when he left its vessel in August 1969. The later vessels on which Lipari shipped out ("Newark" and "Trans Idaho") have no connection with Maritime.

11. The letter was dated June 9, 1972, and it was stipulated by counsel that it was forwarded on that date. It was claimed to have been received by defendant's counsel on June 12, 1972. This latter date was not stipulated but appears in the transcript of hearing of March 21, 1973 as a representation by counsel. The letter itself was marked in evidence.

rejected psychiatric treatment. Under the facts of this case, that finding is not relevant, as we are concerned here, not with a rejection of treatment, but rather with a failure by Lipari to seek treatment.

Lipari testified that after being declared permanently unfit for duty by the United States Public Health Service in November 1970, he knew that he could never work on a ship again (Tr. 121a) and returned to Montreal where he commenced work as a cab driver.

He sought no treatment directed to his "nervousness" although he testified to telling an orthopedic physician about his nervous condition and relating the history of his August 1969 accident to the hospital authorities when he was admitted to the Sacre-Coeur Hospital in December 1971. Neither medical record, however, (both of which are in evidence) reflects this medical history. Of even more importance, the hospital record makes no reference to Dr. Silverstein's prognosis nor to the fact that the plaintiff had ever consulted with a psychiatrist. Lipari did not testify that he had informed the hospital authorities of Dr. Silverstein's examination, an examination which occurred but five months prior to the plaintiff's hospitalization. Strikingly, even after Dr. Silverstein's prognosis and his recommendation for treatment, Lipari sought no treatment.

The record also reveals that Lipari never returned to any Public Health Service facility as he was directed. Nor did he return to the Sacre-Coeur Hospital after his discharge.[12] Aside from the equivocal statements made by plaintiff that he told Dr. Lemaire and the hospital physicians of his nervousness, there is no evidence whatsoever of Lipari's seeking treatment for this ailment during the entire period in question—and this despite his knowledge of the availability of free medical services, both in the United States and in Montreal.

We are satisfied that the evidence clearly demonstrates the plaintiff's failure to seek treatment, and that therefore, on this record a suspension of maintenance and cure for the period in question should be ordered.[13] Sobosle v. United States Steel Corporation, *supra.*

Having held that the findings of the District Court, on which judgment for the plaintiff was predicated, were made in error, the judgment as to maintenance and cure for the period November 24, 1970 to June 27, 1972 will be reversed and the District Court directed to enter judgment for the defendant.

JAMES HUNTER, III, Circuit Judge (concurring in part and dissenting in part):

Maintenance and cure continues until the seaman obtains maximum cure or becomes permanently disabled. *E. g.,* Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949). On November 24, 1970, the Public Health Service in New York declared plaintiff not fit for duty and *permanently* disabled. Although I do not believe that this diagnosis by the Public Health Service is necessarily conclusive,[1] plaintiff did not submit any evidence to contradict the Public Health Service's diagnosis at least for the period between November 24, 1970 and July 15, 1971, when plaintiff first saw Dr. Silverstein. I would therefore deny plaintiff maintenance and cure during this period on the basis that there is no evidence to support a finding that plaintiff was not

---

12. The hospital record in evidence bears the following notation:
   "Condition on leaving—slightly improved— *under periodical checkups.*" [emphasis supplied]

13. Inasmuch as we are concerned here with only the period November 24, 1970 to June 27, 1972, we obviously do not preclude the plaintiff from asserting a claim for maintenance and cure, if appropriate, from or after June 27, 1972.

1. *See* Gore v. Maritime Overseas Corp., 256 F.Supp. 104, 122 (E.D.Pa.1966), rev'd on other grounds, 378 F.2d 584 (3d Cir. 1967).

permanently disabled.[2] Furthermore, I believe that during this "gap" plaintiff's right to maintenance and cure was merely suspended.[3] *See* Farrell v. United States, 336 U.S. 511, 519, 69 S.Ct. 707, 93 L.Ed. 850 (1949); Sobosle v. United States Steel Corp., 359 F.2d 7, 11 & n. 9, 12 (3d Cir. 1966).

Once plaintiff became aware on July 15, 1971 that his disability was not permanent and that "frequent" psychotherapy treatments would be useful as a "curative" measure, I believe the central issue became whether plaintiff acted with "reasonable diligence" to "secure proper treatment." Repsholdt v. United States, 205 F.2d 852, 856 (7th Cir. 1953).

To the extent that Maritime has an *affirmative* duty to *provide treatment* (as opposed to *reimbursement* for maintenance or treatment), I agree with the majority that notice is required. But I am aware of no decision which has held that reimbursement liability for maintenance and cure cannot attach until the shipowner is given notice of the seaman's disability.[4] To fashion such an inflexible rule would disregard, in my view, the possible lack of prejudice to the shipowner from lack of notice[5] and the admonition in *Sobosle, supra,* that, "admiralty recognizes the human rights that are involved, judging the seaman as he is,—subjectively, rather than as he might have been,—objectively, if he were someone else."[6]

Thus, while I agree that Maritime could not have been obligated to *provide treatment* to plaintiff prior to June 9, 1972 at the earliest, I do believe that Maritime would be liable for the stipulated eight dollars per diem maintenance charge from July 15, 1971, *provided* plaintiff made reasonable efforts to seek treatment following Dr. Silverstein's diagnosis on July 15, 1971.[7] However, the record clearly discloses that plaintiff made no reasonable effort from that date forward to obtain the treatment suggested by Dr. Silverstein. And even if plaintiff was unaware of free medical treatment, all he had to do was notify Maritime who would then have had an affirmative obligation to provide treatment.[8] Consequently, plaintiff should not be allowed to recover for maintenance and cure for the period between July 15, 1971 and June 9, 1972 *because he did not make reasonable efforts to seek treatment during this time.*

As for the period between June 9, 1972 and June 27, 1972, I would remand to the district court for two findings: 1) the date on which Maritime received notice that plaintiff was seeking maintenance and cure and 2) whether plaintiff's failure to seek treatment prior to such date was willful. The majority appears to foreclose the latter finding by holding that "on this record a *suspension* of maintenance and cure for the period in question should be ordered." As

2. Even if plaintiff had submitted evidence that he was *never* permanently disabled, I do not think Maritime should be held liable for maintenance and cure during a period in which both parties presumably accepted the conclusion of the Public Health Service.

3. I believe, however, that the right to maintenance and cure is completely *terminated* if a seaman *willfully* delays contesting a diagnosis of permanent disability or if the equitable defense of laches applies. *Cf.* Sobosle v. United States Steel Corp., 359 F.2d 7 (1966). These exceptions have not been raised by Maritime and thus they do not confront us in this case.

4. *Compare,* Brown v. Dravo Corp., 258 F.2d 704 (3d Cir. 1958).

5. A shipowner is prejudiced from lack of notice chiefly when the seaman has failed to seek treatment on his own, thus prolonging the period for which the shipowner will be liable for maintenance and cure.

6. 359 F.2d at 12. *See* Luth v. Palmer Shipping Corp., 210 F.2d 224 (3d Cir. 1954); Murphy v. American Barge Line Co., 169 F. 2d 61 (3d Cir.), cert. denied, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (1948).

7. Maritime would also be liable for any reasonable expenses incurred for treatment, but none were sought by plaintiff.

8. In this sense, notice to Maritime can be considered one factor in determining whether plaintiff made reasonable efforts to seek treatment.

I read *Sobosle, supra,* on which the majority relies for this statement, *suspension,* rather than complete *termination,* of maintenance and cure depends on whether or not the seaman *willfully* refused treatment or, as in our case, *willfully* failed to seek treatment. Thus, by holding that maintenance and cure are suspended, the majority impliedly holds that plaintiff's failure to make reasonable efforts to seek treatment, during the period prior to which Maritime was notified, was not willful. In my view, the district court should decide this issue in the first instance and then apply the *Sobosle* rule.