**Herman NEFF, Appellant,**

v.

**DRAVO CORPORATION.**

**No. 17247.**

United States Court of Appeals Third Circuit.

Argued Nov. 21, 1968.

Decided Feb. 27, 1969.

Rehearing Denied March 21, 1969.

---

Hymen Schlesinger, Pittsburgh, Pa., for appellant.

Bruce R. Martin, Pittsburgh, Pa., for appellee.

Before GANEY, FREEDMAN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

GANEY, Circuit Judge.

This is an appeal solely from the asserted inadequacy of a verdict and judgment entered thereon in favor of the plaintiff in an admiralty action which was filed for maintenance and cure and given the number of 65–15, combined with a civil action for damages, No. 65–322. In the civil action, under the Jones Act, judgment was entered on a verdict in favor of the plaintiff in the amount of $25,000.00, and in the admiralty action for $353.21. The district court tried the two actions separately before the same jury, pursuant to Fitzgerald v. United States Lines, 374 U.S. 16, 83 S. Ct. 1646, 10 L.Ed.2d 720. In the admiralty action, the trial judge transferred the consequential damages which followed from failure to pay maintenance and cure to the civil action to be computed along with the damages arising from the injuries on the civil side of the case. A motion for a new trial in the civil action was granted on June 28, 1968, and on October 20, 1968, there was a denial of the appellant's motion to alter that judgment. Accordingly, there remains only the appellant's appeal from

the verdict which the jury rendered, and the judgment entered thereon in the maintenance and cure action, the civil action for damages being listed for a new trial in the court below.

Herman Neff, the appellant, was sixty-three years of age at the time of trial and had been an employee of Dravo Corporation beginning on August 8, 1947, when he received an injury caused by striking his head on the deck of the ship of the respondent company. He used illness as an explanation of his failure to report for duty from that time on, on various ships, some twenty odd times. His jobs on the various ships of the respondent company were the longest continuous work he had ever done before in his life, some nine years, and before that he had served two terms in the Army and had been, on and off, a migrant worker. He testified that he was in good health when he went to work for the respondent and that his work was almost exclusively in the engine rooms of the various vessels. He testified that the engine rooms contained fumes from the diesel oil, lube oil and also exhaust fumes, which were present at all times when the engine was running and he never recalled a time when there were not fumes in the engine rooms. The fumes had a very strong smell, and could be seen in layers when the sunlight came through the windows. He would feel good when he went back onto the boat on the various times he reported to the respondent company, after time off, but after a couple of days working, the fumes would nauseate him and give him a headache which was the reason, as has been indicated, for his leaving on the number of occasions he did. He went to bed on the night of May 8, 1964, and when he awoke in the morning, he was dizzy and had a headache, as he had been working for three days in a closed compartment painting. On the morning of May 9, 1964, he was compelled to leave the motor vessel, Victory, on which he was employed on the Ohio River, accompanied by another seaman from the vessel, who took him to the respondent's plant clinic. This was the last time he had been employed by the respondent or any other employer. The clinic sent him to the Public Health Hospital in Pittsburgh, where he was treated in the dispensary, and they sent him from there to the Baltimore Marine Hospital where he stayed some twenty-six to twenty-seven days, from June 7, 1964, to July 7, 1964. He was hospitalized again in the Sewickley Valley Hospital in Pittsburgh, from October 14, 1965, to November 7, 1965, and from that time on he was never treated by a physician until he was examined by Dr. Sherman on three separate occasions, August 17, 1967, October 3, 1967, and January 11, 1968.

Dr. Sherman testified that he had examined the Baltimore Hospital records and the Allegheny Hospital records and was acquainted with the Public Health records, but had not seen the records at the Sewickley Valley Hospital before he testified at the trial. He testified to the records of the various hospitals, as well as to his own examination of the appellant, but the records had to be repeatedly gone over as Dr. Sherman testified about one hospital record while having another one before him, and it was most difficult to establish dates, as, for instance, the date of appellant's admission to the Allegheny Hospital, and, generally, the record, as presented, was compiled in a most complicated manner and the briefs on both sides did little to clarify the situation.

The Public Health Service reports, from which Dr. Sherman testified, show that as early as 1950, the appellant had headaches, and this was true during the time he was employed by the respondent on the various ships, although they showed no record of emphysema, which none of the hospital records showed, as will be indicated later, except that taking them into consideration and after his own examination, he made a positive diagnosis of emphysema basing it on the DiBono whistle test and appellant's shortness of breath.

However, a close perusal of the record discloses that Dr. Sherman testified from the Allegheny Hospital records that appellant's condition, as of June 10, 1955, was diagnosed as essential cerebral angiitis. The history before his admission shows that the appellant had been cleaning an engine with a solvent, and, passing out, that he received several blows to the head while on board ship; that he was a heavy drinker of alcohol and smoked at least one pack of cigarettes a day. He further stated that the record showed he had a cerebral vascular insufficiency which, as of the date of his testifying, he stated, had not improved. Particularly, Dr. Sherman stated, "I would certainly say it was aggravated and if he was exposed to fumes, it certainly would be aggravated." He then described the treatment given to a patient suffering from cerebral vascular insufficiency and when asked the direct question whether it would be of benefit to appellant now, he replied, "I question it very very much." Further, that he was suffering from a diabetic condition and emphysema, and that both conditions could be benefited by medical treatment, but, as to the involvement of the central nervous system, he stated, "Medically, that is not going to help him at this stage."

Likewise, Dr. Huber, who saw the appellant at the Allegheny Hospital, testified, by deposition, that at the time he treated him it was for a headache and dilated blood vessels on the right side of the forehead.

At the Baltimore Marine Hospital (June 7, 1964, to July 7, 1964), Dr. Sherman read a summary of his condition at the end of his hospitalization, showing (1) cerebral vascular insufficiency, (2) a diabetes glucose tolerance curve showing appellant had diabetes, and (3) a central nervous system involvement. As to the first finding, Dr. Sherman testified that he doubted very much if anything could be done for him now, but, as to the second finding, the diabetic condition, he should have continued medical care to control it and that nothing could be done for him now for his central nervous system involvement. In commenting on this hospital record, Dr. Sherman said that he should have medical attention presently, that he should not be left without help being given him as his condition was progressing and it would terminate in vegetation.

Here, while no pathological condition was found present and his chest x-rays were alright, the consultant neurologist said his condition was probably due to a case of artery insufficiency, but, in the absence of objective findings, no anti-coagulants were recommended and the only medication given him was Arlidin for diabetes. Dr. Sherman's conclusions, as to diabetes, was, first, that he had diabetes, by reason of the glucose tolerance curve, but later testified that his opinion was conditional diabetes. The report there also showed that, as part of appellant's history, he had told them that he had suffered from persistent frontal headaches for a period of nine years. They also found that there was a slightly abnormal glucose tolerance test and he was placed on an 1800 calorie diet, and that he had a minor form of diabetes. While here, the report showed no condition of emphysema, but Dr. Sherman testified that, in his judgment, he was suffering from emphysema.

Appellant was brought into the Sewickley Valley Hospital on October 14, 1965, and placed in an emergency room by the police because he was found confused. In the hospital's System Review of his cardio-respiratory system, they found that he had no undue shortness of breath, chest pain, chronic cough, palpitation or edema and no past history of pulmonary disease. They found that his chief problem was his inability to walk and his state of mental confusion. They also found that the Romberg test was suggestive of being positive, that is by putting both feet in tandem fashion and closing one's eyes and then putting one foot in front of the other and attempt-

ing to walk, there was a swaying backwards and forwards, and, therefore, the test was found to be positive. However, since the Romberg test at the Baltimore Marine Hospital was negative, Dr. Sherman testified this report showed that his condition was getting progressively worse, even though he had never been on a river boat in the intervening period of time.

The final diagnosis at the Sewickley Hospital showed peripheral neuropathy, that is a pathological condition of surface nerves and perhaps some posterior column degeneration, that is some degeneration of the posterior of the spinal cord, secondarily, diabetes, alcoholism or perhaps some pernicious anemia. Part of the final diagnosis was that he had encephalomyeloneuropathy, chronic, due possibly to past alcoholism. Secondarily, also, was the diagnosis of portalembiosis, which is an infection of the liver. Likewise, the record shows that he had diabetes mellitus, latent. The doctor testified that the central nervous system damage was indicated by the fact that the report showed neuropathy, it being part of the condition described as encephalomyeloneuropathy, which is indicative of chronic central nervous system involvement which had been present for some time.

In short, at the Sewickley Hospital, Dr. Sherman summarized the report succinctly in saying that during the time he was confined from October 14, 1965, to November 7, 1965, (1) he had a tolerance curve showing a diabetic condition, that he must have continued medical treatment to control it, (2) that he was unable to walk unless he had hold of someone, and was in a state of mental confusion, and, as indicated, the Romberg test showed that his condition was worsening, (3) that he had a peripheral neuropathy and degeneration of the posterior part of the spinal cord. He testified that, even excluding a finding of emphysema in the condition of the appellant, he would still be totally disabled,

although he did not see the Sewickley report until he came to the trial to testify.

It was most difficult to evaluate the appellant's testimony as he repeatedly testified that he could not remember dates, nor could he remember what he was treated for at the various hospitals, due to his mental confusion.

When he returned from the Baltimore Marine Hospital, he went to the respondent-company's clinic and Dr. Marshall gave him a "fit for duty" slip and he went back to try to be hired, but when he got to the company to secure work, he was told there was too much seniority against him and that he would not be able to secure employment.

Dr. Sherman's final diagnosis was that the treatments he received at the various hospitals had a direct causal connection with the job he was doing on the ship, breathing the diesel fumes and the painting within a closed compartment, which he was doing previous to his leaving the ship on May 9th, and that he was, as of the date of his examination, completely and totally disabled from working. He further testified that continued treatment would benefit appellant's diabetes and that he should be under the care of his physician, that his emphysema would be benefited by medical treatment, but that no further help could be given him for involvement of the central nervous system and that even though he had not worked on any boat of the respondent company since 1964, and had received no medical attention for some three and one-half years, except at the hospitals adverted to, Dr. Sherman testified that his condition had become progressively worse and medical attention was needed. "You can't let him go without medical attention. It would give him relief, but not stop the progressive deterioration, that medical attention would be very helpful to his lungs as well as to his arteries with respect to vascular insufficiency." In sum, the doctor testified that his final diagnosis as of January 11, 1968, was a

cerebral vascular condition impairing the flow of blood to the brain, involvement of the central nervous system, diabetes and emphysema, and that the fumes which he inhaled while on the boat did not create the condition from which he was suffering, but they aggravated a pre-existing condition. Dr. Sherman testified, " * * * if anything, it was becoming progressively worse", and had worsened as of the date he examined him finally on January 11, 1968.

The question posed here concerns the broad concept of curative treatment or cure, whether medical attention for relief from suffering when a doctor testified—uncontradicted—it was needed, should be a sufficient condition to warrant maintenance even though it could not stop a progressive deterioration.

While there is a seeming ambiguity in Dr. Sherman's testimony concerning the Allegheny Hospital report, that medical treatment could not help him, it is apparent that this was meant by way of cure, for his final statement from the reports and his own examination, as heretofore indicated, was "You can't let him go without medical attention. It would give him relief, but not stop the progressive deterioration. * * *"

In Farrell v. United States, 336 U.S. 511, 515, 69 S.Ct. 707, 709, 93 L.Ed. 850, the Court states: "It is claimed that when the Court reserved or disclaimed any judgment as to cases where the incapacity is caused 'by the employment' or 'by the seaman's service' it recognized or created such cases as a separate class for a different measure of maintenance and cure. We think no such distinction exists or was premised in the *Calmar* case." [Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.] Here the petitioner's condition, as described in the record, was caused by the nature of his employment on ships of the respondent company. At page 518, at page 711 of 69 S.Ct., it stated: "That the duty of the ship to maintain and care for the seaman after the end of the voyage only until he was so far cured as possible, seems to have been the doctrine of the American admiralty courts prior to the adoption of the Convention by Congress, despite occasional ambiguity of language or reservation as to possible situations not before the court. It has been the rule of admiralty courts since the Convention."

In Pyles v. American Trading & Production Corporation, 5 Cir., 372 F.2d 611, there is an indication of an amelioration of the rigid rule with respect to maintenance. At page 619, the court states: "What we hold is that a seaman cannot remain silent and wait until such time as pleases his convenience to assert a claim and then recover for days worked of his own free choice * * *. *Nor is he entitled to maintenance and cure if he is not sufficiently ill or disabled as to make advisable some kind of medical attention.*" (Emphasis ours.) This, in effect, maintains he is entitled to maintenance and cure when in need of medical attention.

In Gilmore and Black, Admiralty, p. 265, 267–268 (1957), it is stated: "The period of time for which * * * an injured seaman may have maintenance is presumably the same period for which he is entitled to medical expenses until he has recovered or until the maximum cure has been achieved."

In Gibson v. United States, D.C., 100 F.Supp. 954, a case analogous in some ways to the instant one, Judge Kalodner of this court, then in the district court, stated, at p. 957, "* * *. Accordingly, it is unrealistic to say that once physiological improvement in Gibson's heart muscle ceased, further treatment was not 'of a curative nature'. Any treatment which relieved him of physical pain and the attendant mental anguish, under the circumstances was 'curative' in the true sense of the word even though the damage to his heart may never be further repaired." This language was affirmed by this court in 200 F.2d 336, in a per curiam opinion.

In Yates v. Dann, 124 F.Supp. 125, the late judge Leahy, in the district

**234**

court of Delaware, stated, at page 140: *"In this case right to maintenance and cure continues from the time of his discharge as an in-patient in the Marine Hospital on June 10, 1946, to the present date, during which time libellant has been in need and should have benefited by medical care and attention. The painful condition has persisted.* The Public Health reports disclose at no time was he discharged from out-patient status, and the last report of 1951 discloses he was still in need of treatment at that time." (Emphasis ours.)

On appeal, this court, speaking through Judge McLaughlin, Yates v. Dann, 223 F.2d 64, at 67, stated: "On the facts, the district court's finding that libellant was still in need of medical care and attention at the time of the trial is not 'clearly erroneous.' See McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20."

This view of maintenance and cure was approved in Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88, in withholding maintenance and cure which had been denied to the petitioner, it was stated, at 533, at 1001 of 82 S.Ct.: "We think the view of the Third Circuit (see Yates v. Dann, 223 F.2d 64, 67) is preferable to that of the Second Circuit as expressed in Wilson v. United States [229 F.2d 277] and Perez v. Suwanee S. S. Co. [239 F.2d 180], supra, and to that of the Fourth Circuit in this case.", reversing the same.

In Sobosle v. United States Steel Corporation, 359 F.2d 7, at page 11, Judge Freedman of this Court stated: "The obligation of the shipowner for the maintenance and cure of a seaman continues, once it has attached, until the seaman has attained the utmost cure possible, unless he willfully and unreasonably refuses the medical aid which would benefit him." See Gardner v. Sinclair Refining Co., 227 F.2d 958 (3rd Cir.1955); Luth v. Palmer Shipping Corp., 210 F.2d 224 (3rd Cir.1954).

In Brown v. Dravo Corporation, 258 F.2d 704, this Court, speaking through Judge Maris, stated, at page 709: "The duty to provide maintenance and cure did not stop with the libellant's severance from employment, Murphy v. American Barge Line Co., 3 Cir., 1948, 169 F.2d 61, * * * for it is the duty of the ship to maintain and care for the seaman after the end of the voyage until he is so far cured as possible. Farrell v. United States, 1949, 336 U.S. 511, 518, 69 S.Ct. 707, 93 L.Ed. 850. The duty to provide maintenance and cure thus continues until the time when the maximum cure possible has been effected, and the district court did not award the libellant more than this."

██ In Gooden v. Sinclair Refining Company, 378 F.2d 576 (3rd Circuit), the court succinctly set forth the doctrine of the obligation toward the seaman for maintenance and cure by the shipowner, in stating as follows: "This obligation arises from the fact that the seaman, while in the service of Sinclair's ship, Vaughan v. Atkinson, 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), became disabled through no insubordination, vice or misconduct of his own. Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). It makes no difference that the disability was completely unrelated to the seaman's employment on Sinclair's ship, Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949). The obligation to provide maintenance and cure continues *until maximum medical recovery has in fact been achieved,* Vaughan v. Atkinson, 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), notwithstanding the issuance of Public Health Service fit for duty slips, Koslusky v. United States, 2 Cir., 208 F.2d 957, 959; Permanente Steamship Corp. v. Martinez, 9 Cir., 369 F.2d 297, 299; Labenz v. National Shipping & Trading Corp., 153 F.Supp. 785, 786 (E.D.Pa. 1957)." (Emphasis ours.)

It is the claim of the Dravo Corporation, the respondent, that its obligation for maintenance stopped when the appellant was checked at the Public Health

Service and given a "fit for duty" slip by Dr. Marshall at the company clinic on July 27, 1964. However, as has been indicated, the courts, in a number of cases, have held that the certificate of the Public Health Service is not conclusive as to his right for maintenance, including our own circuit in Gooden v. Sinclair Refining Company, *supra*. On the other hand, the appellant claims maintenance and cure from July 27, 1964, the date up to which the respondent is agreeable to pay maintenance, down to the date of trial.

The trial court, in its charge, stated: "If you find that as of July the 27th, 1964, he was not cured but suffered a condition that was incurable as of that date, even though further medical care might be of benefit in arresting the further progress of his disease, or in giving him relief from pain or discomfort, he is, likewise, not entitled to recover on this claim beyond the amount agreed to."

This portion of the charge, repeated in varying language, in its totality, envisions a status frozen in time, that on a day certain one is cured, and maintenance ceases from that day on. With this view, we do not agree, in the light of Dr. Sherman's final diagnosis of the appellant's condition, as this language of the charge was too narrow and confining.

It would serve no useful purpose to attempt to rationalize from the plethora of cases in order to define the legal concept of maintenance and cure, except to state that each case is predicated upon its own peculiar factual circumstances. Thus the necessity here for the long, factual recital, in an attempt to thread the way through the maze of judicial interpretations, some rigidly restrictive of the phrase and some drawing from it an expansive connotation giving warrant for presenting the particular circumstances as within the ambit of an elusive phrase.

In this day of rapid change in the field of medicine and surgery, when miracle drugs are daily advancing man's life expectancy, and longevity is increasing, the connotation of "cure" must be considered a continuous process. At least in cases where, as here, the medication is allegedly necessary to arrest what would otherwise be a deteriorating condition, we think it may be of a sufficiently curative nature to be encompassed within the doctrine of maintenance and cure. Accordingly, in the light of the facts *of this record,* we hold the claim here to be embraced within the connotation of "cure", as used in the phrase "maintenance and cure." (Emphasis ours.)

This holding will, in no wise, conflict with the problem of future damages in the civil action awaiting trial, for, in charging the jury, the lower court will be guided so as not to duplicate damages in its total award or, in the event the jury's verdict favors the respondent, the appellant will at least have received maintenance during the period.

We here, accordingly, adopt as the guideline for the interpretation of the phrase "maintenance and cure" in this circuit the language of Judge Kalodner, as adverted to heretofore, in Gibson v. United States, *supra,* and affirmed by this Court in a per curiam opinion, likewise adverted to earlier, at 200 F.2d 336, as well as the language expressed in Yates v. Dann, *supra,* affirmed by this Court and given sanction by the Supreme Court in Vaughan v. Atkinson, *supra.*

Accordingly, we reverse the decision of the lower court and order a new trial thereon, since no post-trial motion for judgment n. o. v. was filed by the appellant.

Judgment reversed.

FREEDMAN, Circuit Judge, concurs in the result.