Adolph **BERKE**, Plaintiff-Appellant,

v.

**LEHIGH MARINE DISPOSAL CORP.**,
Defendant-Appellee.

No. 170, Docket 33819.

United States Court of Appeals,
Second Circuit.

Argued Nov. 10, 1970.

Decided Dec. 24, 1970.

Paul C. Matthews, John F. X. Mc-Kiernan, New York City, for plaintiff-appellant.

William F. Larkin, Schaffner & D'Onofrio, New York City, for defendant-appellee.

Before LUMBARD, Chief Judge, and WATERMAN and ANDERSON, Circuit Judges.

WATERMAN, Circuit Judge:

Plaintiff-appellant Berke commenced this action against his employer to recover damages resulting from personal injuries which he suffered when he fell overboard from the scow S–3 in Greater New York Harbor on March 7, 1965. His first cause of action was premised on the alleged unseaworthiness of the scow and, under the Jones Act, on the alleged negligence of the employer. His second cause of action was for maintenance and cure. Seeking indemnity, the employer impleaded the owner of the tug which was towing the S–3 at the time of the accident. At the end of plaintiff's case the trial judge granted defendant's motion to dismiss the complaint on the ground that there was insufficient evidence to take the case to the jury on either of the two counts. The propriety of that decision is the subject of this appeal.[1] We affirm the dismissal order.

The following sketch of the facts is undisputed. At about midnight on March 6, 1965, the scow S–3, owned and operated by the defendant-appellee, was berthed under the Brooklyn Bridge where it had been loaded with debris and was being prepared to be towed to sea by a tug operated by the third-party defendant. The scow was approximately 200 feet in length and 40 feet in width and contained four pockets in which the debris was heaped in cone-shaped piles. Around the pockets and along the perimeter of the scow ran a walkway approximately three feet in width. Plaintiff Berke was the scow's captain and was the sole crew member of the S–3.

When the tug arrived to take the S–3 out to sea, Berke and one Mullin, a deckhand on the tug and an old friend of Berke, made the necessary tie-up. After preliminary maneuvering in the harbor, the tug towed the S–3, secured by a line 400 to 500 feet long, to sea. Out at sea, the tug captain signaled Berke to open the doors at the bottom of the pockets in order to dump the debris into the ocean. Berke responded and, after the dumping, the tug with the scow in tow headed back to New York. After dawn, Berke was observed by Mullin scraping the #1 pocket with a long pole. Approximately fifteen minutes later, as the tug was approaching the Verrazano Bridge, the tug slowed in order to shorten the tow lines so as to pull the S–3 alongside for better maneuverability in the harbor. A signal was given for Berke to help in changing the ropes but he did not appear.

---

1. The third-party complaint was also dismissed but the propriety of that dismissal is not before us on this appeal.

Therefore, the S–3 was pulled in immediately astern of the tug, and Mullin was sent on board to find Berke and to handle the ropes in bringing the scow alongside. After the manipulating of the ropes had been accomplished and after a search of the scow for Berke had proved fruitless, Mullin observed something, which turned out to be Berke, splashing in the water some distance astern of the scow. Berke was rescued and taken to the Marine Hospital on Staten Island, where he was treated for pneumonia and congestive heart failure. He was discharged on April 2, 1965, with the notation "Fit for duty." Since that time, Berke, then 65, has allegedly suffered marked physical and mental deterioration.

Plaintiff contends in his first cause of action that he fell overboard as a result of an alleged lack of equipment to clean the muddy debris off the deck of the scow and the alleged absence of a hand line around the perimeter of the boat. However, apparently because of his deteriorated mental state, Berke, though present in court during the trial, did not testify and Mullin was plaintiff's sole witness on the issues of negligence and unseaworthiness. In support of plaintiff's claims, Mullin testified that there was no hand line in place on the S–3 when he was helping Berke tie up under the Brooklyn Bridge on March 6, 1965, or on previous occasions; that at these times he had not seen the customary equipment for cleaning off the deck; and that he himself had slipped on the deck of the S–3 during Berke's rescue. However, the testimony as to the lack of cleaning equipment was stricken because Mullin had traversed only part of the S–3's perimeter that night and because he had not been looking for the equipment on any of the occasions mentioned. On cross-examination Mullin admitted that it was customary for hand lines to be removed during loading and that he was not surprised when he did not see them in place when the tug was

made fast to the barge under the Brooklyn Bridge.

The trial judge's exclusion of Mullin's testimony relative to cleaning equipment was proper inasmuch as, under the circumstances, Mullin's testimony amounted to no more than a statement that he did not know whether such equipment was on the S–3. Nor does Mullin's testimony as to the condition of the scow at the time of Berke's rescue supply the evidence needed to show the alleged lack of cleaning equipment and hand lines. As Berke was the sole crew member of the S–3, an absence of hand lines from the deck perimeter and a slippery condition of the deck evidenced Berke's own failure to perform his duties as scow captain if the proper equipment were in fact available to be used by him. While we agree with the plaintiff that there was sufficient evidence to permit the jury to infer that he fell overboard because of the slippery condition of the deck and the lack of hand lines, see Schulz v. Pennsylvania R. Co., 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668 (1956), plaintiff failed to produce any evidence that the S–3 was not equipped with hand lines and cleaning equipment which Berke could have used if he were so inclined. In *Schulz* there was evidence of the defendant's negligence and the Court there was concerned solely with whether that negligence was a cause of the drowning. Here, though, counsel, through more thorough discovery, could have obtained further information as to the presence or absence of proper equipment on the S–3. He did not do so, and, without this added proof, the jury, having been left to pure speculation on the issue of negligence and unseaworthiness, could never have reached the issue of causation. See Schlichter v. Port Arthur Towing Co., 288 F.2d 801, 804–805 (5 Cir.), cert. denied, 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961). Although the trial judge dismissed the action for failure of plaintiff's proof as to causation, we can and do affirm on the separate ground[2] that there was insufficient

2. It is well settled that an appellate court may affirm a correct result reached below even though an erroneous reason for the decision was given by the lower

proof to go to the jury on the question of negligence and unseaworthiness.

 Plaintiff also complains that the trial judge made an adverse inference from Berke's failure to testify and that Berke's pretrial deposition, offered in lieu of witness-stand testimony, should have been admitted into evidence. However, on the grounds we have above stated, a directed verdict would have been proper even without an adverse inference. Counsel offered no competent testimony to prove that Berke was incompetent to testify at the trial and, without such a foundation, Berke's deposition was inadmissible. Rule 32(a) (3) [formerly Rule 26(d) (3)], F.R.Civ.P. In any event, had it been admitted, the deposition, in which Berke narrated circumstances, uncorroborated and incapable of being corroborated, concerning vessels in the vicinity of the S–3 at the time of the accident, would have been of little value to plaintiff's case because this imaginative narration would seem to demonstrate that Berke apparently was not fully competent even at the time of the deposition.

 On the issue of maintenance and cure, one Dr. Reichman, who had twice examined Berke solely for the purposes of trial, testified on the basis of these two examinations and Berke's hospital record. On cross-examination he admitted that all of Berke's ailments listed in the hospital reports for the hospitalization immediately following the accident, except for his aggravated bronchitis, pre-existed the accident or

were cured upon Berke's discharge from the Marine Hospital on April 2, 1965. As to the aggravated bronchitis, he testified that further treatment would only relieve the symptoms but would not permanently improve the condition. On this testimony there was no evidence on which the jury could have inferred that Berke had not reached maximum cure[3] upon the April 2 discharge from the Marine Hospital and the directed verdict on this count was properly entered.

Affirmed.

---

court. See, e. g., Helvering v. Gowran, 302 U.S. 238. 245–246, 58 S.Ct. 154, 82 L.Ed. 224 (1937); S & S Logging Co. v. Barker, 366 F.2d 617, 623 (9 Cir. 1966).

3. A seaman is not entitled to "cure" past the point at which his condition cannot be further improved. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949); Fitzgerald v. United States Lines Company, 374 U.S. 16, 19, 83 S.Ct. 1646, 10 L.Ed.2d 720 n. 7 (1963) ; Travis v. Motor Vessel Rapids Cities, 315 F.2d 805, 810–811 (8 Cir. 1963); Desmond v. United States, 217 F.2d

948, 950 (2 Cir. 1954). cert. denied, 349 U.S. 911, 75 S.Ct. 600, 99 L.Ed. 1246 (1955); Stewart v. Waterman S. S. Corp., 288 F.Supp. 629, 634 (E.D.La. 1968), aff'd, 409 F.2d 1045 (5 Cir. 1969), cert. denied, 397 U.S. 1011, 90 S.Ct. 1239, 25 L.Ed.2d 423 (1970). We point out that we are aware that the Third Circuit has recently expanded the definition of "cure" to include those situations where, as here, the plaintiff could receive out-patient palliative treatment for a permanent condition, Neff v. Dravo Corp., 407 F.2d 228 (3 Cir. 1969), and that we have not overlooked that decision.