Morris SEIFRIED

v.

MON RIVER TOWING, INC.

Civ. No. 72-655.

United States District Court,
W. D. Pennsylvania.

March 14, 1974.

234

Hymen Schlesinger, Pittsburgh, Pa., for plaintiff.

Stephen Graffam, Grogan, Graffam & McGinley, Pittsburgh, Pa., for defendant.

## OPINION AND DECREE

SNYDER, District Judge.

This Court held a Non-Jury Trial on an action filed by the Plaintiff which contained two claims. The first claim was for Maintenance and Cure for an illness sustained while in the service of the Defendant's vessel, and in the second claim Plaintiff sought damages for breach of an oral agreement to include the Plaintiff in the Pension Plan of the Defendant Company. As these matters are entirely separate, they will be considered *seriatim*.

## DISCUSSION

The testimony was clear, and the Court so finds, that the Plaintiff was an employee of the Defendant. He served as a Pilot and/or Master on various of Defendant's vessels. These vessels were owned by the Defendant and operated by it on the Ohio and Monongehela Rivers. Plaintiff began his employment for the Defendant as a Relief Captain on July 28, 1965. He became ill (depressed) on October 26, 1970 and did not return to work until April 22, 1971. He continued to work until September 21, 1971 at which time he left work because of his illness. This illness has continued until the present time. The parties stipulated that the claim for Maintenance and Cure is based on the rate of $8.00 per day, for a total of $8,208.00 (1,026 days). These figures include 179 days between October 26, 1970 and April 22, 1971, at $8.00 per day or the sum of $1,432.00, and 847 days from September 21, 1971 through the closing of the trial on January 15, 1974, at $8.00 per day or the sum of $6,776.00.

Mr. Seifried went into the Maritime Service in 1928 when he was eighteen years of age. He worked continuously until he became ill on October 26, 1970 with the nervous condition and had to "get off the boat". He had gone to work with Mon River Towing, Inc. on July 28, 1965 and first began to notice the illness about a year before it affected him in such a way that he felt he had to stop working.

Approximately four days after becoming ill, on November 3, 1970, he went to the United States Public Health Service and received various medications and consultations. At that time there was a recommendation that he be sent to the United States Public Health Service Hospital in Baltimore, Maryland for complete evaluation. The Hospital records indicate that the patient (Seifried) elected to be evaluated by his own private doctor, Doctor Silverblatt. Mr. Seifried testified that he was not getting along very well at the Public Health Service Hospital, and on the recommendation of his son, he decided to go to Doctor Silverblatt.

After receiving treatment for a period of time, he felt better and returned to work on April 22, 1971. However, on September 21, 1971, he felt so bad that he had to again leave the service of the ship. Doctor Silverblatt then sent Seifried to Doctor Lebovitz and at this time he was hospitalized in Western Pennsylvania Hospital from October 19, 1971 to November 23, 1971, primarily for a de-

pressive reaction. During his stay in the Hospital he was given electric wave therapy. Shortly after his discharge from Western Pennsylvania Hospital, Seifried developed considerable rectal bleeding and was subsequently hospitalized at Montefiore Hospital from February 9, 1972 to February 22, 1972; at this time he underwent surgery for a polyp. After the experience at Montefiore Hospital, Seifried became very depressed and was immediately put back on psychotropic medications for his nervous condition. The medications helped somewhat and during this period, Seifried indicated, for the first time, that part of his problem arose from the fact that since 1965 he had worked on boats with mufflers and under circumstances involving excessive noise. He said it was when he went back to work that the sound caused him to get sick again. Doctor Lebovitz came to the conclusion that he would simply get sick again if he went back to work.

Despite this, in April of 1972, the Doctor advised Seifried to return to work. However, Seifried did not return to work and did not see the Doctor again until July of 1972. At that time Seifried did not appear to be excessively depressed, but the Doctor indicated that his impression was that Seifried could not withstand the stress of going back to the particular type of work he had been doing. The Doctor did not see him again until January of 1973. The Doctor noted at that time that he was doing reasonably well, but was still unable to return to work. He was seen again in June of 1973 and the Doctor noted he was having periods of hyperactivity when he would do everything at a very fast pace. This seemed to be a deterioration of his condition from earlier in the year. In particular it indicated a reduced ability to handle even minimal stress. The Doctor continued to see Seifried throughout 1973, and in October of that year, finally came to the conclusion that Seifried was not capable of working at anything. The Doctor expected to have to see Mr. Seifried every two or three months, probably for the rest of his life, in order to keep the situation under control. The final diagnosis was of a manic-depressive illness which was thought to be of a permanent nature.

Seifried entered the Public Health Service Hospital in Baltimore, Maryland, where he was a patient from November 9, 1973 to November 30, 1973. He was given a complete physical examination, a great many laboratory tests, and underwent neurological evaluation. The diagnosis was again that of a manic-depressive psychosis, and the conclusion was reached that there was very little that could be done for Seifried except to structure and minimize the confusion that the patient was experiencing. It was noted that he was discharged as being unfit for duty and his condition was to be followed up in the Pittsburgh Out-Patient Clinic, which was the nearest Public Health Service facility.

I. MAINTENANCE AND CURE.

The Defendant in this case recognized the duty of the vessel and her owner to provide Maintenance and Cure for Seamen injured or falling ill while in the service of the vessel. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 528, 58 S. Ct. 651, 82 L.Ed. 993 (1938); Lipari v. Maritime Overseas Corporation, 493 F. 2d 207 (3rd Cir. 1974); Neff v. Dravo Corporation, 407 F.2d 228 (3rd Cir. 1969); Sobosle v. United States Steel Corporation, 359 F.2d 7 (3rd Cir. 1966). The Defendant, however, claims that it is entitled to a credit for disability benefits and medical expenses paid by Travelers Insurance Company under a group insurance policy. The Defendant further contends that the Plaintiff is not entitled to maintenance during the period of time when he was hospitalized, or when he was living with relatives during a fifteen day period in 1971 when he visited his daughter in Sun Valley, Idaho, or during a second visit of thirty-five days in July and August of 1973.

As previously indicated, the total claim for maintenance was agreed to be $8,208.00, against which there is claimed

a credit of $3,040.29 for the days spent in the hospital. The total of fifty days spent visiting his daughter would amount to another $400.00. Combining these figures, the total credit claimed is $3,440.29 for these time periods.

With respect to the amounts paid by Travelers Insurance Company, it was stipulated that the total amount of medical bills incurred by the Plaintiff was $5,996.95, of which Travelers Insurance Company had paid $4,966.05. The Plaintiff claims the amount of $5,966.95 for cure while the Defendant claims that the Plaintiff is entitled only to $1,033.-90.

The Plaintiff stands on the proposition that the Defendant is not entitled to take credit for the amounts paid by Travelers Insurance Company since such payments represent collateral source benefits, or in the alternative, that they are not to be applied against the claim for Maintenance and Cure.

█ The Plaintiff would have us start with the well known proposition that the Court is the guardian of the Seaman, and all doubts, if any, must be resolved in favor of the ward of the Admiralty. Citing: U. S. Bulk Carriers v. Arguelles, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971). *Arguelles* involved a suit by a Seaman for wages allegedly due him and he was permitted to recover over the contention by the defendants that Section 301 of the Labor Management Relations Act prevented such a suit. This Court adopts this as basic to the problem, but the question remains as to the effect of the payment by Travelers Insurance Company.

The Defendant, Mon River Towing, Inc., was a named insured in a group policy (together with other affiliated companies). In this policy all of the premiums were paid solely by the company, except that the Dependents Insurance was to be on a contributory basis. Dependents Insurance did provide for the employee's wife and all unmarried children over fourteen days and under nineteen years of age, residing in the United States. All employees whose employment commenced on or before January 1, 1968, and who were not employed on a part-time or intermittent basis, were qualified to participate.

The only case to which Defendants have called the Court's attention is Thomas v. Humble Oil & Refining Company, 420 F.2d 793 (4th Cir. 1970) which involved a claim for maintenance and a denial by Humble on the basis that Humble had a private disability plan which paid Thomas more than the maintenance allowance. In that case there was a voluntary organization designated as the Esso Seamen's Association and certified by the National Labor Relations Board in Humble's operation as the representative of the unlicensed personnel such as Thomas. A Collective Bargaining Agreement was in force between the Association and the Company which recognized Humble's private disability plan for which no contribution was exacted from the employees. The Crew's Articles embraced its terms and were signed by Thomas each time he sailed on a Humble vessel. The Bargaining Agreement stipulated, among other things, that maintenance should not be paid concurrently with the payments under the disability benefit plan unless the maintenance was in excess of the plan's payments, in which case the $8.00 rate was to apply.

The Court in the *Thomas* case held that the agreement together with the plan it incorporated did not pretend to provide for the payment of wages. The Court then stated in affirming the action of the District Court in dismissing the libel on the basis that Thomas had in effect been paid in full, as follows (at p. 794):

"This agreement together with the plan it incorporates does not pretend to provide for the payment of wages. It simply supplements and embroiders maintenance. Besides assuring satisfaction of maintenance, the plan gives the qualifying seaman for a period of

26 weeks, after leaving the vessel, the equivalent of his full pay plus $1.20 per day for each day that he does not receive board and lodging. These payments are halved for the following 26 weeks. After these fifty-two weeks the agreement goes beyond the plan and awards the seaman $8.00 per day until he reaches maximum cure. *Never can the installments fall below the maintenance allowance.*

True, every employee ashore participates in the disability plan. Nevertheless, the privilege of others did not pinch Thomas' enjoyment of maintenance. Nor did the circumstance that once he was paid nothing for a month and was told that he must 'come down and sign a paper [before he] could get any money'. This occurrence does not prove the plan a deprivation of maintenance.

It is objected, further, that Humble under the plan deducted for a biweekly period a thrift contribution of $27.-44, a thrift fund loan of $30.14, $6.65 towards an annuity contract. It is not suggested that these items were permitted to diminish or in any degree encroach upon maintenance. Thomas' brief complains that the company can suspend benefits for employee fault, change of address, failure to release the employer, or employee failure to do anything the employer requires. However, it points to no instance when these reservations were enforced or were applied to curtail maintenance.

Thomas acknowledges he has received all benefits payable to him under the plan and agreement. But he wants this and maintenance too. As previously noted, the plan and agreement do not provide for wages. They assure maintenance and possible extras. These have been furnished, and so Thomas is not due additional moneys.

Finally, we have also considered the complaint that Thomas did not understand the operation of the agreement when taking ship in his several passages, and did not realize that the receipts he gave also constituted releases of all liability to him. However, we find with the District Court that all aspects of his employment were intelligibly explained and fully comprehended by him.

In sum, the collective bargaining agreement between Humble and the Seamen's Association, which includes plan benefits, does not, as accused, evade the intent of the statute, 45 U. S.C. § 55, as adopted by 46 U.S.C. § 688, which denounces devices to exempt the employer from any liability to seamen. Rather, through this agreement, the company has provided and preserved the ingrained maintenance of the general maritime law. We conclude that in this regard Humble has punctiliously kept the laws of the sea."

The importance of the *Thomas* case seems to lie in the fact that the Court considers the plan to be a form of indemnity against liability by payment into a fund for that purpose and, thus, should not be penalized by permitting the Plaintiff double recovery under the fund as well as the full measure of damages.

Thus, for example, in Haughton v. Blackships, Inc., 462 F.2d 788 (5th Cir. 1972) a boatswain brought action for personal injuries and a question arose as to whether in computing damages payable to the seaman it was improper to consider the seaman's maritime pension in mitigation of damages on the theory that the pension was a benefit directly attributable to the employer under the collateral source rule where, though all of the money in the retirement fund was contributed by the employer, the fund was established by virtue of a contract between the employer and the union. The Court found that such contract was in the nature of a fringe benefit or deferred compensation and, thus, was not established by the employer for the pur-

pose of indemnifying itself against liability. The Court then stated as follows (at p. 790):

"Finally, appellant urges as error that the court considered appellant's retirement benefits in mitigation of damages, thus contravening the proper application of the collateral source rule. This legal area merits some explanation.

The trial court found that the retirement benefits received by Haughton were from a fund established by virtue of a contract between Blackships and the National Maritime Union, that all of the money in the fund was contributed by the employer Blackships and that Haughton's pension was a benefit directly attributable to the employer. This collateral source income, the court said, should be considered in mitigation of damages, since it was derived from a fund directly attributable to the employer and not one to which the employee also contributed. In reaching its conclusion, the court scrutinized and distinguished Eichel v. New York Central R. R. Co., 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963); and New York, New Haven & Hartford R. R. Co. v. Leary, 204 F.2d 461, 468 (1st Cir. 1953), cert. denied, 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 370 (1953).

After a review of the reported cases and related policy considerations, we reverse on this issue. In considering the applicability of the collateral source rule, the basic principle to be applied is that the employer-tortfeasor is not entitled to mitigate damages by setting off compensation received by the employee from an independent source. However, it is also true that the source of the funds may be determined to be collateral or independent, even though the employer-tortfeasor supplies such funds, United States v. Price, 288 F.2d 448 (4th Cir. 1961). *See also* Annot., 75 A.L.R.2d 886 (1961).

Application of the collateral source rule depends less upon the source of funds than upon the character of the benefits received, Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 534–535 (9th Cir. 1962). The mere fact that the employer-tortfeasor has contributed money (by payment of premiums, contributions, etc.) to the fund from which the benefits derive does not establish that such fund may not be a collateral source, Hall v. Minnesota Transfer Ry. Co., 322 F.Supp. 92, 95 (D.Minn.1971), and cases cited therein.

*Hall*, a FELA case, is particularly helpful in resolving the instant appeal. In that decision the 'collateral source' was a medical and hospitalization policy which, as a result of a collective bargaining agreement, was instituted to cover employees' premiums that were to be paid by the employer directly to the insurer. The district court reasoned as follows, relying on United States v. Price, 288 F.2d 448, 450 (4th Cir. 1961):

The collective bargaining contract between that employee group and the defendant Railroad includes, as an economic term, a requirement that the employer pay premiums directly to the insurer, much as an employer might at the direction of his employee deduct money from wages and forward them directly to that employee's creditor or bank savings plan. This policy is, in short, a fringe benefit given in part consideration for the employee's services. It is in no sense a mere gratuity nor an arrangement by which the company has undertaken voluntarily to indemnify itself against possible liabilities to injured employees under the FELA.

.   .   .   .   .   .

On the basis of the foregoing, the court concludes that where the insurance policy is one of general hospital and medical coverage upon which the insured may make claim

without regard to liability on the part of the employer, such a policy is a fringe benefit maintained by the employer and is in effect part of the employee's income for services rendered, and the collateral source rule prohibits set-off of premiums paid or benefits received thereunder by the employee.

*Id.,* 322 F.Supp. at 96, 97.

As in United States v. Price, the court in *Hall* placed far more importance upon the character of the benefits received and what such benefits were designed to do than upon whether they were paid, either directly or indirectly, by the employer. *See also* Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 534–535 (9th Cir. 1962). It is instructive to compare *Hall* with Thomas v. Humble Oil & Refining Co., 420 F.2d 793 (4th Cir. 1970) wherein the disability plan provided for in the collective bargaining agreement supplemented and embroidered the normal maintenance and cure payments and in no way pretended 'to provide for the payment of wages,' 420 F.2d at 794. Contrary to a plan containing fringe benefits given solely in return for the employee's services for which set-off would be improper, the benefit at issue in *Thomas* is best characterized as a voluntary undertaking by the employer to indemnify itself against its possible legal liabilities for payment of maintenance and cure. In this latter situation, set-off was properly allowed.

The facts in United States v. Price, cited *supra,* serve to underscore this distinction. A government worker injured at a shipyard brought a Federal Tort Claims Act suit against the government. A set-off against the damage award was claimed by the government for all funds received through the plaintiff's Civil Service Retirement and Disability annuity. The court refused to permit the set-off, noting that the annuity was established by the government with a different purpose in mind than for the compensation of injuries. *See also* Jennings v. United States, 291 F.2d 880, 887–888 (4th Cir. 1961); United States v. Gallops, 207 F.2d 48, 50 (5th Cir. 1963).

The policy considerations for the collateral source rule are apparent. On the one hand, an employer-tortfeasor who voluntarily undertakes to indemnify itself against liability by payment into a fund for that purpose, should not be penalized by permitting the plaintiff a double recovery of his benefits under the fund as well as his full measure of damages. On the other hand, where the employer-tortfeasor makes payment directly or indirectly into a fund established for an independent reason, or where such payment by the employer should be considered in the nature of a fringe benefit or deferred compensation, the employer should not be entitled to benefit by setting off such income in mitigation of his responsibility as a tortfeasor.

Accordingly, the trial court's deduction of the maritime pension to the extent of $3,500 in mitigation of damages awarded to appellant was improper. The case is therefore reversed and remanded for modification of the decree entered so as to be consistent with this opinion." (Emphasis supplied.)

Applying the principles as set forth in *Thomas* and *Haughton,* it is apparent to the Court that the policy here in question was established for an independent reason outside of indemnification for liability and thus must be considered in the nature of a fringe benefit and the employer can then not set-off such amount in mitigation of its responsibility. Accordingly, the Plaintiff is entitled to the full amount of the Maintenance Claim of $8,208.00 without deduction for the amounts paid by Travelers Insurance Company. Cf. Ward v. Union Barge Line, 443 F.2d 563 (3rd Cir. 1971) where the seaman's employer

was held not entitled to credit against a claim for maintenance and cure for the "redline time" during which the seaman was carried on the payroll while ill, in absence of a provision in the collective bargaining agreement providing for such credit. Citing Haywood v. Jones & Laughlin Steel Corp., 107 F.Supp. 108 (W.D.Pa.1952) decided by Chief Judge Gourley (now Senior Judge) holding that since the obligation to pay maintenance and cure is definite where a seaman sustains injuries in the furtherance of his employment, in the absence of a specific agreement between the seaman and his employer, that payments that are advanced subsequent to an accident are to be credited or set-off against the amount which the employer is required to pay for maintenance and cure, it would be improper to allow such credit. See Blake v. Delaware & Hudson Ry. Co., 484 F.2d 204 (2nd Cir. 1973); Wagner v. Reading Company, 428 F.2d 289 (3rd Cir. 1970); Hall v. Minnesota Transfer Railway Company, 322 F.Supp. 92 (D.Minn.1971).

■ There remains to consider the contention of the Defendant that they are entitled to a credit of $400.00 for the fifty days during which the Plaintiff visited with his daughter in Sun Valley, Idaho. The Defendant refers us to Section 573, Norris, The Law of Seamen, 3rd Ed., Page 92 of Vol. 2, in which the following appears:

"The recovery for maintenance and cure is limited to the amount he has actually expended or for which he has obligated himself. Where he lives at the home of his parents and has incurred no actual expense or liability for his care and support, he is not entitled to a decree or judgment of maintenance and cure." Citing United States v. Johnson, 160 F.2d 789 (CA9 Cal.1947) affirmed as to maintenance and cure and reversed in part on other grounds, 333 U.S. 46, 68 S. Ct. 391, 92 L.Ed. 468; and Robinson v. Swayne & Hoyt, Ltd., 33 F.Supp. 93 (D.C.Cal.1940).

■ In both of these cases the seaman had either refused hospital services or had left the hospital and gone home. But the facts are not regarded as affecting the fundamental rule that maintenance and cure will not be awarded without proof of expenditures actually made or incurred. In the instant situation the mere fact of visiting the daughter for a very short period of time does not, in the opinion of this Court, affect the $8.00 per day agreed figure. Our present situation, therefore, can be distinguished from those situations where a family member resided with another member of his immediate family for some length of time, and the guest received maintenance as a gratuity while he was recuperating from his injury. See McCormick Shipping Corp. v. Duvalier, 311 F.2d 933 (5th Cir. 1963); Stewart v. Moore, 334 F.Supp. 396 (S. D.Tex.1971); Duplantis v. Williams-McWilliams Industries, 298 F.Supp. 13 (E.D.La.1969). Here, the Plaintiff has no present hope of any return to his past employment as a seaman, and his short visits to his daughter's home were simply for that purpose. That is not to say that if the claimant was relieved of any obligation for his maintenance for an extended period of time, that this would not affect the outcome. However, in the instant case there was no testimony of this, and thus we hold that the Plaintiff is entitled to his full Maintenance Claim without a deduction for the periods of time spent visiting his daughter.

## II. PENSION RIGHTS.

The second claim of the Complaint seeks damages for breach of an alleged oral agreement of employment under which, as one of the terms, Defendant promised and agreed that the Plaintiff would be included in "The Pension Plan" which had previously been established for the benefit of the employees. The unrebutted testimony of the Plaintiff was that at the time of his employment the now deceased President of the Company, had told him that as one of

the conditions of employment he would be included in the Pension Plan. The Plaintiff testified that the then President stated he would be eligible for his pension ten years from the date that he started working for the Company which would have been July 28, 1975.

The Plaintiff was first employed by the Defendant on July 28, 1965. He was over fifty-five years of age at that time and did not have any prior employment with Mon River Towing, Inc. (which, of course, was known to the Defendant by Seifried's Application for Employment). At one time subsequent to the death of Jessie B. Guttman, who had hired the Plaintiff, Howard Guttman, who was then President of the Company, told the Plaintiff when he threatened to quit because of not being included in the Pension Plan, that he (Seifried) would be entitled to the full benefits of the Plan.

Under Section 7.07 of the Pension Trust Agreement providing for disability benefits to employees of the Defendant, it is provided as follows:

"Notwithstanding any other provision of this Trust, except Section 13.-09, if a participant with at least five (5) years of participation incurs, prior to his normal retirement date, a disability which, in the opinion of a physician selected by the Trustees, renders him totally and permanently incapable of performing his duties satisfactorily for at least six (6) months, his employment shall be terminated and his disability benefit shall be determined in accordance with the early retirement provisions of Section 5.03, and shall be paid in such manner as the Trustees determine to be for the best interest of the participant."

Under Section 2.01 of this Agreement it was provided as to participation:

"Each salaried employee is eligible to be a participant on the first entry date of this Trust on or before which he shall have attained the age of twenty-five (25) years and shall have completed two (2) years of continuous employment with the Employer, . . . ."

An amendment to the basic Pension Trust executed May 26, 1970, deleted a provision that prohibited participation for any employee who had attained the age of sixty years at the time he would otherwise have become eligible to be a participant. It also deleted a provision which limited the maximum entry age for future employees to fifty-five years. Since Plaintiff was at that time sixty years old, he concluded then that he was not covered because of the amendment. The Defendant argues that had the Original Section 2.01 *not* been amended, the Plaintiff would never have been come eligible to be a participant in the ·Pension Trust Plan since his date of birth is April 5, 1910 and his initial date of employment with the Company was July 28, 1965, at which time he was over fifty-five years of age. In this, of course, the Defendant misconstrues the employment contract which was to include Plaintiff within the Pension Plan under the facts as then known by the employer and guaranteed by the May 26, 1970 amendment.

Defendant claims that the first entry date on which the Plaintiff attained the age of twenty-five years and had completed two years of continuous service with the employer as required by Section 2.01 was March 25, 1968.[1] Un-

1. The March 25, 1968 date is reached by reading Section 2.01 along with Section 1.11 which states, 'Entry date' shall mean the effective date of this Trust and each anniversary thereof." Therefore, Plaintiff would have had to work two years from July 28, 1965 which would bring him to July 28, 1967. Since Section 1.11 provides for an entry date on the anniversary of the Trust which is March 25th, then Plaintiff would have been required to work either five years from the March 25, 1968 date or work five years from July 28, 1967 (initial two years of continuous service as required by Section 2.01), and continue his employment until March 25th, the anniversary of the Trust and the effective "Entry Date" as set forth in Section 1.11.

der the provisions of Section 7.07, as set forth above, the Plaintiff was required to have been a participant for five years following *March 25, 1968,* before becoming entitled to any disability benefits under the Trust. This seems to be the obvious conclusion since the Plaintiff himself testified that the past President told him that he would be eligible for pension on July 28, 1975. Former Section 1.13 states as follows:

"Normal Retirement Date" shall mean: for an employee not over the age of fifty-five (55) on the entry date when he becomes a participant, the first day of the month coincident with or next following his sixty-fifth (65th) birthday; for an employee over the age of fifty-five (55) on the entry date when he becomes a participant, the tenth anniversary of such entry date, or the first day of the month coincident with or next following his seventieth (70th) birthday, whichever is first."

Certainly Plaintiff was promised to be made part of the Pension Plan, but such promise could only have been based on his meeting all the requirements for participation.

In regard to early retirement, Section 5.03 provided:

"If a participant shall cease to be an employee within five (5) years of his normal retirement date, this shall be considered as an early retirement provided the participant shall have completed fifteen (15) years of continuous service in the employ of the Employer. The Trustees shall proceed as if the participant had retired at normal retirement date except that his pension income shall be reduced to its equivalent actuarial value based on mortality tables and interest rates as adopted from time to time by the Employer. Payments shall start, at the election of the participant, on the early retirement date or on any intervening date."

"Normal retirement date" was defined at Section 1.13 of the Second Amend-

ment to the Basic Pension Trust as the first day of the month coincident with or next following a participant's sixty-fifth birthday. Since the Plaintiff's birthday was April 5, 1910, and since he would be sixty-five on April 5, 1975, his normal retirement date would have been May 1, 1975. The Defendant then argues that even if the Plaintiff ceases to be an employee of the Defendant prior to May 1, 1975, he would not be entitled to any benefits under the early retirement provisions of Section 5.03 because he would not have completed fifteen years of continuous service in the employ of the Defendant. Thus, the Defendant says in substance that the Plaintiff is not entitled to any payments for disability since he did not have the required five years participation under Section 7.07. Furthermore, Plaintiff would not be eligible for early retirement since he did not meet the requirements of Section 5.02.

The Plaintiff to the contrary argues that notwithstanding the fact that the Plaintiff was not eligible by virtue of age (over fifty-five) and lack of five years continuous service, he was promised that he would be included in the Pension Plan when he was hired. He is, therefore, contending that there was a complete waiver of all the requirements for eligibility. Under the circumstances as shown by the evidence in this case, we think that the testimony was that the Plaintiff was hired under condition that he would be made a participant in the Plan but there is no indication whatsoever that the particular requirements to be qualified for benefits were in any way waived. Therefore, since he did not have the required five years of participation, he was then not entitled to any benefits for disability nor any early retirement benefits.

■ The Plaintiff also makes claim for the benefit of a policy of life insurance. Under the Trust Agreement, in Section 4.01, the Trustees had the option to either apply for a policy on the life of each eligible employee or to accumulate the necessary funds in a separate invest-

ment fund to provide the required benefits. It was admitted that the Company neither provided a policy on the life of Morris Seifried nor accumulated any funds in a separate investment fund. However, it is noted that the provisions for a life policy related only to "eligible employees". As noted above, to be eligible there was only required two years of continuous employment with the employer and a maximum entry age of future employees of fifty-five years. It is further provided that if any eligible employee shall die after having complied with all of the requirements for participation and before a policy shall be in force on his life, any employer contributions held by the Trustees to pay the initial premium on the policy shall be paid to the estate of the deceased employee, or if the employee has designated a beneficiary, then to such person (Section 2.-04). Furthermore, it was provided in Section 2.05 that in lieu of the foregoing eligibility, any member (Guttman) in its Affiliation Agreement may specify for its employees "a different eligibility based upon a combination of employment service and age provided that said eligibility requirements are satisfactory to the Trustees and are not contrary to the requirements of the Internal Revenue Service." In Section 2.06 it was set forth: "The decision of an Employer as to eligibility of its Employees and to the benefits to which they are entitled shall be final."

It was admitted by the Defendant that the Trust Agreement would have provided a policy of life insurance with the face amount of $7,200.00. The exact amount of the cost of this insurance was reserved until after the decision of the Court on liability. Since we find that the Defendant is liable for these premiums, Counsel will be requested to submit a Stipulation as to the cost of such a policy. Furthermore, we think the extent of the Defendant's liability must be limited to the period of time during which the employee would have been eligible to have received the contribution to be made by the Company. By letter dated March 23, 1972, Morris Seifried was properly given a "leave of absence" status with the Company and hence the liability for such insurance premiums ceased at that time. This arises from the fact that eligibility for these insurance payments was only during the period of continuous employment and by Section 2.02 which is defined as:

> "Employment for the purposes of this Article shall be continuous if it is interrupted by a leave of absence authorized by the employer, however, no employee shall become a participant until his return after such absence and the period of absence shall not be counted in determining years of continuous employment. Further, no leave of absence shall be for a longer period than two (2) years."

The testimony before the Court is that the employee is totally disabled and will not return to work and that, therefore, the Company's obligation would be to pay to the Plaintiff the amount of the premium for such insurance from the date of his hiring on July 28, 1965 to March 1, 1972, when he was placed on "leave of absence" status.

### III. COUNSEL FEES.

Plaintiff in this case also claims counsel fees under the doctrine set forth in Norris, The Law of Seamen, Section 578, Page 105. Citing as authority, Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) rehearing denied 370 U.S. 965, 82 S.Ct. 1578, 8 L. Ed.2d 834; and Alcoa S.S. Company v. Watson, 313 F.2d 522 (1st Cir. 1963). The District Court in *Vaughan* upheld an allowance of consequential damages and attorney's fees. The allowance of counsel fees was justified by virtue of the inclusion of "necessary expenses" as items of damage arising out of the suffering and physical handicap which follows the failure to give maintenance and cure. But the Court in that case based its holding as follows: (369 U.S. at pp. 530–531, 82 S.Ct. 999.

> "In the instant case respondents were callous in their attitude, making

no investigation of libellant's claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was willful and persistent."

In a case involving this very problem, Gulledge v. United States, 337 F.Supp. 1108 (E.D.Pa.1972), Chief Judge Joseph S. Lord III stated (pp. 1113, 1114):

"The final issue involved here is whether plaintiff may recover for counsel fees. In Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L. Ed.2d 88 (1962), the Court held that in an action for maintenance and cure, counsel fees could be recovered as part of damages, reversing a decision by the Fourth Circuit. In *Vaughan*, the Court found the shipowners to be callous in their attitude toward the seaman's claim, making no investigation of it.

'As a result of thtat recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was willful and persistent. It is difficult to imagine a clearer case of damages suffered for failure to pay maintenance than this one.' *Vaughan, supra,* 369 U.S. at 531, 82 S.Ct. at 999.

After *Vaughan*, most courts have confined an award of counsel fees as part of damages to those situations where the shipowner was acting in bad faith in an arbitrary and capricious manner in denying maintenance and cure. E. g., Richard v. Bauer Dredging Co., 433 F.2d 954 (C.A. 5, 1970); Roberts v. S.S. Argentina, 359 F.2d 430 (C.A. 2, 1966); Roberson v. S/S American Builder, 265 F.Supp. 794 (E.D.Va.1967).

In this case, the withholding of maintenance and cure was not the result of the shipowner's bad faith recalcitrance, but an honest belief that plaintiff was guilty of gross misconduct and thus not entitled to maintenance and cure. To allow recovery here for counsel fees we would have to conclude that 'attorneys' fees have been made a routine element of damages to be paid any seaman who wins a contested maintenance and cure suit.' Jordan v. Norfolk Dredging Company, 223 F.Supp. 79, 83 (E.D. Va.1963). While we find ourselves persuaded by the reasoning of the *Jordan* decision, we find that this Circuit has at least impliedly followed the majority view, and we are of course bound by its determination.

In Johnson v. Mississippi Valley Barge Line Company, 335 F.2d 904 (C.A. 3, 1964), the court upheld the district court's rejection of plaintiff's requested charge to the jury that if a shipowner fails to provide maintenance and cure it is liable for counsel fees as consequential damages. It was indicated that recovery of counsel fees does not routinely follow an award for maintenance and cure. 'In denying this request, the district court observed that there was nothing in the record which would support an award of attorneys' fees.' *Johnson, supra,* 335 F.2d at 907 (footnote 2).

This Circuit in denying counsel fees in an admiralty case, has observed that though there are exceptions to the general rule against assessing attorney's fees, 'the cases applying these exceptions invariably involve wrongfulness or injustice often amounting to bad faith.' Gore v. Clearwater Shipping Corporation, 378 F.2d 584, 588 (C.A. 3, 1967).

Therefore, in the situation presented by this case where there is absolutely no evidence of bad faith, plaintiff may not recover for counsel fees." (Emphasis supplied.)

██ We find this reasoning most persuasive and since in the instant case we believe the withholding of Maintenance and Cure was not the result of the shipowner's bad faith or recalcitrance

but an honest belief that the Plaintiff was not entitled to Maintenance and Cure, we feel that in the present situation as well, the Plaintiff may not recover for counsel fees.

### IV. INTEREST.

In this instant case the Plaintiff also claims interest on the Maintenance and Cure. We believe that the Plaintiff is entitled to interest on the Claim for Maintenance and Cure. Hudspeth v. Atlantic & Gulf Stevedores, Inc., 266 F. Supp. 937 (E.D.La.1967); Hazelton v. Luchenbach Steamship Company, 134 F. Supp. 525 (D.Mass.1955). Interest was allowed by Judge Sorg of this Court when he entered judgment in Ward v. Union Barge Line, C.A. 66–960. The Third Circuit affirmed the judgment including interest on the claim for maintenance, 443 F.2d 565, at 572 (1971). Therefore, Counsel for the Plaintiff, Morris Seifried, will be directed to submit a proposed order in accordance with the holdings of this Court as set forth in this Opinion.